**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| PARK ELECTROCHEMICAL CORP.<br>and NELTEC, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| vs. | ) | No. CV 04-4916 |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY, | ) | |
| Defendant. | ) | |

Defendant, Continental Casualty Company ("Continental"), submits the following

Memorandum in Support of its Motion for Summary Judgment:

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 1

II.  FACTS ................................................................................ 2

    A.  The Parties ................................................................. 2

    B.  The Loss ..................................................................... 2

    C.  Insurance Claim ......................................................... 2

    D.  Continental's Policy .................................................. 3

        1.  The Named Insured Under The Policy .................. 3

        2.  The Territorial Limit Under The Policy ................ 3

        3.  The Contingent Business Interruption Provision In The Policy .................. 7

III.  ARGUMENT ..................................................................... 14

    A.  The Loss Took Place In Singapore, Outside of the Territorial
        Limit Covered  Under the Policy.................................. 14

B.   For Contingent Business Interruption Coverage to Apply,
the "Supplier" Cannot be a Subsidiary of the Insured …………………….......... 17

IV.  CONCLUSION …………………………………………………………………….. 21

1078824.1

# TABLE OF AUTHORITIES

### CASES
        **Page**

*Bulk Pack, Inc. v. Fidelity & Deposit Co. of Maryland,*
    163 Fed. Appx. 298 (5th Cir. 2006) ……………………………………….. 15

*CH Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of Louisiana, Inc.,*
    918 S.2d 1060 (2005) …………,…………………………………………… 18

*DNA Plant Technology Corp. v. Navigators Ins. Co.,*
    941 F.Supp. 42 (D.N.J. 1996) ……………………………………………... 14

*Karen Tscheme v. Nationwide Mutual Insurance Co.,*
    2003 Ohio App. Lexis 5558 …………………………………….............. 15

*Rydman v. Martinolich Shipbuilding Corp.,*
    13 Wash. App. 150, 534 P.2d 62 (1975) ………………………………….... 15

*Seitlin & Co. v. Doebler,*
    489 So. 2d 1200 (Fla. App. 1996) …………………………………………… 15

*Tel-Tru Manufacturing Co., Inc. v. North River Insurance Co.,*
    90 A.D. 2d 670, 456 N.Y.S. 2d 287 (App. Div. 1982) …………………………… 15

*United States Lines Co. v. Eastburn Marine Chemical Co.,*
    221 F. Supp. 881 (S.D.N.Y. 1963) …………………………………………… 14

*Zurich American Insurance Co. v. ABM Industries, Inc.,*
    397 F. 3d 158 (2nd Cir. 2005) ……………………………………………... 18

### TREATISES

1 Stephen A. Cozen,  Insuring Real Property, §3.03[2] (2004) …………………………… 18

A.Miller, 719 PLI/LIT 341 (2005) ……………………………………………… 18

P.Tarr, Where Have All The Customers Gone?  The Brief, Winter 2001 ……………… 18

1078824.1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **PARK ELECTROCHEMICAL CORP.** | ) | |
| **and NELTEC, INC.,** | ) | |
| | ) | |
| **Plaintiff(s)** | ) | |
| **vs.** | ) | **No. CV 04-4916** |
| | ) | |
| **CONTINENTAL CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant(s)** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT,**
**CONTINENTAL'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiffs Park Electrochemical Corporation ("Park") and Neltec, Inc. ("Neltec")[1] are seeking to recover contingent business interruption coverage under a policy of insurance issued by Continental Casualty Company ("Continental").  No contingent business interruption coverage, however, is afforded under the policy.  First, the loss giving rise to the contingent business interruption claim occurred in Singapore, which is outside of the relevant territorial limit set in the policy – the United States of America.  Second, for contingent business interruption coverage to apply, the "supplier" – whose property was damaged – must be a third-party and not a subsidiary of the insured.  Here, the "supplier" was Nelco, a subsidiary of Park located in Singapore that provided material to Neltec, another subsidiary of Park.

For both reasons, Continental's policy does not cover the contingent business interruption claim of Park and Neltec.  Accordingly, Continental, as a matter or law, is entitled to summary judgment.

---

[1] Park and Neltec are also collectively referred to as "Park."

## II.   FACTS

### A.   The Parties

Neltec is a wholly owned subsidiary of Park.  (Complaint, Introductory Paragraph.  A copy of the Complaint is attached and marked Exhibit 1.)  Neltec sells a line of electronic materials, known as N6000, to customers in the electronics industry, which then manufacture multilayer printed circuit boards and interconnected systems.   (Complaint, Exh. 1, ¶¶ 1-2.)  Neltec obtained prepreg, a component of the N6000 line of materials, from Nelco Products Pte., Ltd. ("Nelco").  Nelco is another wholly owned subsidiary of Park.  (Complaint, Exh. 1, ¶¶ 2-3.)

Neltec is located in Tempe, Arizona.  (Complaint, Exh. 1, ¶¶ 10, 16, 20.)  Nelco is located in Singapore.  (Complaint, Exh. 1, ¶ 3; Park's Answer to Interrogatory No. 2.  A copy of Park's Answers to Interrogatories is attached and marked Exhibit 2.)

### B.   The Loss

On November 27, 2002, an explosion occurred in a treater at Nelco's facility in Singapore.  (Complaint, Exh. 1, ¶ 5.)  The treater was the equipment in which the prepreg was manufactured.  (Complaint, Exh. 1, ¶ 4.)

### C.   Insurance Claim

Park and Neltec allege that, because of the explosion at Nelco's Singapore facility, Neltec's sole source of prepreg for manufacturing the N6000 product was interrupted. (Complaint, Exh. 1, ¶¶ 5, 26, 27, 30.)  Accordingly, Park and Neltec have made a claim with Continental for lost income under the contingent business interruption provision of the policy. (Complaint, Exh. 1, ¶¶ 6, 32.)  Park and Neltec maintain that the lost income was $2,631,086. (Complaint, Exh. 1, ¶ 40; Park's Answer to Interrogatory No. 12, Exh. 2.)

Nelco's facility in Singapore was separately insured by Royal & SunAlliance Insurance (Singapore), Ltd. ("Royal").  Nelco made a claim with Royal and has been paid $7,392,634. (Park's Answers to Interrogatory Nos. 15-16, Exh. 2.)

### D.    Continental's Policy

#### 1.   The Named Insured Under The Policy

Park was the named insured under a property policy, No. RMP 210728811 ("Policy"), issued by Continental.  (A copy of the Policy is attached and marked Exhibit 3.)

As to the "Named Insured," the Policy provided:

> **1.   NAMED INSURED    PARK ELECTROCHEMICAL CORPORATION**
>                                      5 Dakota Drive
>                                      Lake Success, NY  11042
>
> and its ***subsidiary or affiliated companies*** as of the date hereof.
>
>                            *        *        *

(Policy, Exh. 3, I.1, p. 1) (Emphasis in original.)

#### 2.   The Territorial Limit Under The Policy

The Policy contained the following condition:

> **1.    TERRITORIAL LIMITS**
>
>        The coverage territory is The United States of America, including
>        its territories and possessions, and Canada.

(Policy, II.  General Conditions, 1. p. 7.)  The Territorial Limits is in the General Conditions section of the Policy; Section IV.  Coverage, where the Contingent Business Interruption provision is found, specifically states that it is subject to "all other policy provisions".  (Policy, Exh. 3, IV. A., p. 16.)  The Policy also contained a Schedule of Locations, listing 15 locations, *all* located in the United States, including the facilities for Neltec at 1420 and 1444 W. 12th Place in Tempe, Arizona.  (Policy, Schedule of Locations and Limits, Form L1000.)

3

AON Risk Services ("AON") served as Park's broker for the placement of the Policy with Continental.  (Park's Answer to Interrogatory No. 6, Exh. 2; Bandyopadhy Dep., p. 6, ll. 4-11; p. 16., ll. 9-22.  A copy of select pages of the deposition of  Krishna Bandyopadhy is attached and marked Exhibit 4.)  The person from AON who placed the property insurance coverage for Park was Krishna Bandyopadhy.  (Bandyopadhy Dep, Exh. 4, p. 6, ll. 1-21; p. 7, ll. 3-7; p. 16., ll. 9-22; p. 18, ll. 2-7.)  She identified her role on the Park account in placing the property insurance as getting information from Park, including property values, locations, and exposure data; compiling it together; and forwarding it to the insurance company.  (Bandyopadhy Dep, Exh. 4, p. 34, ll. 23-25; p. 35, ll. 1-20.)  She sent Mr. Bill Griffin of CNA[2] a letter dated January 6, 2002, asking CNA to look at the Park account and give a proposal.  (Bandyopadhy Dep, Exh. 4,  p. 50, ll. 21-25; p. 51, ll. 1-6.)  Enclosed with the letter was the Property Specification, which she prepared.  (Bandyopadhy Dep., Exh. 4,  p. 53, ll. 7-20.  A copy of Ms. Bandyopadhy's January 6, 2002 letter is attached and marked Exhibit 5, and a copy of the Property Specification is attached and marked Exhibit 6.)  On the Property Specifications, for the category "Territory," she indicated the United States of America.  (Property Specification, Exh. 6.)  By this, she was seeking coverage for the U.S. operations of Park.  (Bandyopadhy Dep, Exh. 4,  p. 55, ll. 6-21.)  Since she was seeking coverage for Park's U.S. operations, then any property loss, to be covered, had to occur within the United States.  (Bandyopadhy Dep, Exh. 4,  p. 55, ll. 22-25; p. 56, ll. 1-2, 5.)  Neither Park nor its broker AON requested that Continental cover locations outside of the United States.  (Park's Answer to Interrogatory No. 5, Exh. 2.)

_____

[2] Continental Casualty Company is part of CNA.

Continental prepared a document entitled "PROPERTY SUBMISSION/ WORK ORDER," dated May 29, 2002, that identified the Territory as "Domestic." [3]  (A copy of the Property Submission/Work Order is attached and marked Exhibit 7.)

The underwriter for Continental for the Policy was Mr. Jim Butridge.  (Butridge Dep., p. 3, ll. 8-10; p. 20, ll. 9-11.  A copy of select pages of the deposition of Jim Butridge is attached and marked Exhibit 8.)  At the time he underwrote the Policy, he was an underwriting director, but is now the Produce Line Manager for Large Property.  (Butridge Dep., Exh. 8, p. 7, ll. 18-24; p. 8, ll. 1-2; p. 9, ll. 1-6.)  According to Mr. Butridge, for contingent business interruption, the property damage has to occur within the territorial limit stated in the policy.  (Butridge Dep., Exh. 8, p. 15, ll. 18-24; p. 16, ll. 1-3, 17-21; p. 40, ll. 2-12, 18-24; p. 41, ll. 17-21.)  He specifically testified that the physical damage *and* any interruption of business income must both occur within the territorial limit of the Policy, i.e., the United States or Canada.  (Butridge Dep., Exh. 8, p. 42, ll. 1-9; p. 43, ll. 15-24; p. 44, l. 1.)  In fact, he testified that, for a contingent business interruption loss to be covered, the supplier (here, Nelco), which suffered the physical damage to its property, must be located within the United States, its territories, or Canada. (Butridge Dep., Exh. 8, p. 45, ll. 1-8, 17.)

Mr. Greg Hunger, who is employed by Continental as a Senior General Adjuster, specializes in first-party property claims.  He handled the claim submitted by Park.  (Hunger Dep., p. 6, ll. 13-21; p. 15, ll. 18-22; p. 17, ll. 13-24; p. 58, ll. 9-17; p. 59, ll. 14-16.  A copy of select pages of the deposition of Greg Hunger is attached and marked Exh. 9.)  Mr. Hunger testified that, for contingent business interruption coverage to apply here, the loss had to occur in the United States, its territories or Canada.  (Hunger Dep., Exh. 9, p. 36, ll. 6-12, 18-21.)  The

---

[3] A box on the form was marked with an "x" for "Domestic."  The box for "global" was blank.  (Property Submission/Work Order, Exh. 7.)

loss here, however, occurred in Singapore.  (Hunger Dep., Exh. 9, p. 36, ll. 22-25; p. 37, ll. 1-5; p. 38, ll. 13-15.)  Accordingly, no coverage would be afforded because Singapore was not within the geographical territory of the Policy.  (Hunger Dep., Exh. 9, p. 38, ll. 16-20; p. 44, ll. 24-25; p. 45, ll. 1-6, 19-22; p. 48, ll. 4-6; p. 49, ll. 18-24.)

Along these lines, Mr. Hunger, at the beginning of his investigation, sent a reservation of rights letter to Mr. Murray Stamer of Park, dated September 23, 2003,  in which Mr. Hunger identified reasons why the contingent business interruption claim of Park may not be covered. (A copy of Mr. Hunger's letter dated September 23, 2003 is attached and marked Exhibit 10.) Mr. Hunger quoted the "Territorial Limits" provision set forth in the General Conditions of the Policy.  He then stated that the contingent business interruption claim of Park may not be covered under the Policy.  (September 23, 2003 letter, Exh. 10, p. 1.)  One of the reasons he identified was: ". . . the Nelco Products Pte., Ltd. facility, which is located in Singapore, is outside of the coverage territory specified in the policy." (September 23, 2003 letter, Exh. 10, p. 3.)  In another letter from Mr. Hunger, this one dated June 16, 2004, and sent to Mr. Kevin Mitchell, the Risk Manager for Park, Mr. Hunger referred back to his September 23, 2003 letter and stated that the issues identified in that letter were still valid.  He added that, per that letter, the loss did not appear to be covered.  (A copy of Mr. Hunger's June 16, 2004 letter is attached and marked Exhibit 11.)  Again, one of the grounds set forth in the letter as to why the Policy might not respond was that the loss occurred outside of the territorial limit.

Andrew Loughlin is a Vice President in the property and casualty risk management group of AON.  (Loughlin Dep. p. 3, ll. 9-10; p. 5, ll. 7-14.  A copy of select pages of Andrew Loughlin's deposition is attached and marked Exhibit 12.)  In 2003, he began working on the Park account for AON as the account manager.  (Loughlin Dep., Exh. 12, p. 22, ll. 5-12, 23-25.)

6

As the account manager, he was the person who had primary contact with Park. (Loughlin Dep., Exh. 12, p.24, ll. 3-10.) Mr. Loughlin identified Krishna Bandyopahdy as the person from AON primarily involved with the placement of the property policy with Continental. (Loughlin Dep., Exh. 12, p.28, ll. 17-24; p. 29, ll. 23-27.) After Park's insurance claim came in, he discussed it with Ms. Bandyopahdy and discussed whether the Policy provided coverage. (Loughlin Dep., Exh. 12, p. 47, ll. 3-9, 14-16; p. 48, ll. 13-18.) One of the things they discussed was whether the Policy provided domestic coverage only. (Loughlin Dep., Exh. 12, p. 48, ll. 19-23.) Ms. Bandyopahdy told him that the Policy was domestic, which he understood to mean that it covered the U.S. operations of Park only. (Loughlin Dep., Exh. 12, p. 49, ll. 6-15.) This was significant because the loss happened in Singapore, and consequently, the claim may not be covered. (Loughlin Dep., Exh. 12, p. 49, ll. 19-21; p. 50, ll. 3-4.) He also discussed with Ms. Bandyopahdy the Policy's definition of "territory" and understood the territory was the United States and its possessions. (Loughlin Dep., Exh. 12, p. 50, ll. 20-25; p. 51, ll. 6-8.) Based on that territorial limit, he felt the property loss in Singapore might not be covered. (Loughlin Dep., Exh. 12, p. 51, ll. 9-17.) He also discussed with Ms. Bandyopahdy the business interruption values submitted by Park in placing coverage with Continental. (Loughlin Dep., Exh. 12, p. 51, ll. 22-25.) He determined that no exposures, business interruption values, or limits were reported with regard to the Singapore location, and this might impact the application of coverage. (Loughlin Dep., Exh. 12, p. 52, ll. 2-20.) Further, he discussed with Ms. Bandyopahdy that all the Park locations identified in the Policy were U.S. locations and no values for Singapore were reported. (Loughlin Dep., Exh. 12, p. 53, ll. 2-18.)

      3.   The Contingent Business Interruption Provision In The Policy

The Policy also provided:

### 3.   CONTINGENT BUSINESS INTERRUPTION

Subject to the sublimit specified in Section **I.4.** of this policy, the Company will pay for the loss resulting from necessary interruption of business conducted at **Locations** occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:

**a.**   any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured; or

**b.**   any real or personal property of direct customers to whom the Insured's product(s) is shipped, which wholly or partially prevents the acceptance of said product(s).

(Policy, Exhibit 3, IV. A. 3., p. 18.) (Emphasis in original.)

The underwriter on the Policy, Mr. Butridge, defined contingent business interruption as the interruption to the insured's business from a loss at a *non-owned* supplier or customer. (Butridge Deposition, Exh. 8, p. 12, ll. 5-9.) Mr. Butridge distinguished contingent business interruption from business interruption: "Business interruption is a claim for the loss of profits or income from a property owned by the insurer. In contrast, contingent business interruption is a claim for the business interruption to an insured property from a non-owned, non-controlled premises." (Butridge Dep., Exh. 8, p. 12, ll. 10-16.) Mr. Butridge added that his understanding of contingent business interruption was based on common insurance industry practice. (Butridge Dep., Exh. 8, p. 12, l. 24; p. 13, l. 1.) He emphasized that the property damage, from which the contingent business interruption claim arose, had to occur at a non-owned location in the territory of the Policy. (Butridge Dep., Exh. 8, p. 15, ll. 18-24; p. 16, ll. 1-3; p. 17, ll. 6-14; p. 29, ll. 8-10; p. 30, ll. 4-9; p. 45, ll. 1-8, 17.)

Mr. Butridge emphasized another point: He did not consider Park's claim to be a contingent business interruption claim. Rather, because the explosion occurred in Singapore at an owned location, i.e., a subsidiary of Park, the claim was really one for business interruption.

8

(Butridge Dep., Exh. 8, p. 17, ll. 20-24; p. 18, ll. 1-3, 18-24; p. 19, ll. 1, 6-11, 19-21; p. 20, ll. 1-8; p. 26, ll. 18-24; p. 27, l. 1; p. 34, ll. 22-24; p. 35, ll. 1-4; p. 36, l. 24; p. 37, ll. 1-4, 8-13; p. 39, ll. 23-24; p. 40, l. 1.)

Notably, Mr. Butridge had a meeting with Park's risk manager and the broker from AON, Krishna Bandyopahdy, on March 28, 2002, in which he discussed the need for business interruption (not contingent business interruption) coverage for Park's foreign and American exposures.  (Butridge Dep., Exh. 8, p. 19, ll. 19-24; p. 20, ll. 1-24; p. 21, ll. 1-11; p. 22, ll. 10-11.)  At this meeting, Mr. Butridge asked whether he should look into covering the foreign locations.  He was informed by Park's risk manager not to because the foreign exposures were adequately covered.  (Butridge Dep., Exh. 8, p. 23, ll. 15-24, p. 24, l. 1.)  Mr. Butridge mentioned that there could be a gap in coverage because Park had two separate policies for the owned locations (the foreign and the domestic).  Nevertheless, the risk manager said he felt adequately covered and did not want Mr. Butridge to respond to the foreign locations.  (Butridge Dep., Exh. 8, p. 24, ll. 1-5.)

Mr. Greg Hunger handled the Park claim for Continental.  In his September 23, 2003 letter to Park, he quoted the "Contingent Business Interruption" provision set forth in the Policy and stated that the claim may not be covered under the Policy. (September 23, 2003 letter, Exh. 11, pp. 1-2.)  He then stated:

> Additionally, Nelco Products Pte, Ltd. may not be a "direct supplier" within the meaning of the Contingent Business Interruption coverage of the policy.  The intent of the policy is not to provide a Contingent Business Interruption coverage for losses arising from physical damage at locations owned by the insured nor for losses resulting from such interdependencies. Nelco Products Pte., Ltd. appears to be a subsidiary of Park Electrochemical Corporation. Your September 17, 2003 letter refers to Nelco Products Pte., Ltd. as "an affiliated company."

(September 23, 2003 letter, Exh. 11, p. 3.)

9

Mr. Hunger also testified that Park's Singapore location (Nelco), where the explosion occurred, would not be a direct supplier for purposes of contingent business interruption because it was a related company to the insured, Park.  (Hunger Dep., Exh. 9, p. 41, ll. 17-25; p. 42, ll. 21-22.)  Mr. Hunger emphasized that it was well understood in the insurance field that a supplier, for purposes of contingent business interruption insurance, was a non-related entity, and he felt Park's risk manager and Park's professional broker, AON, understood this.  (Hunger Dep., Exh. 9, p. 42, ll. 1-3; p. 43, ll. 3-9.)  Mr. Hunger, like Mr. Butridge, noted that Park's claim did not qualify as a contingent business interruption claim.  (Hunger Dep., Exh. 9, p. 49, ll. 18-23.)

Ms. Paula Campiglia was the person from AON, who primarily worked on Park's claim. (Campiglia Dep., Exh. 13, p. 47, ll. 11-13.  A copy of select pages of the deposition of Ms. Paula Campiglia is attached and marked Exhibit 13.)  Ms. Campiglia testified that she was familiar with contingent business interruption losses.  (Campiglia Dep., Exh. 13, p.48, ll. 15-18.)  She testified that, for a contingent business interruption loss, someone *other than the insured* suffered a loss, which caused the insured to suffer a business interruption loss.  (Campiglia Dep., Exh. 13, p. 48, ll. 9-14.)  Ms. Campiglia stated that here, the supplier, Nelco (in Singapore), was a subsidiary of Park, and she learned this from Mr. Murray Stamer of Park.  (Campiglia Dep., Exh. 13, p. 48, ll. 19-22; p. 49, ll. 2-4, 12-18.)

Ms. Campiglia explained that AON gave a Claim Preparation Manual ("Claim Manual") to insureds as a guideline on what to do in the event of a loss.  Here, she supplied the Claim Manual to Park's risk manager, Kevin Mitchell.  (Campiglia Dep., Exh. 13, p. 84, ll. 19-25; p. 85, ll. 2-25; p. 86, ll. 11-14.)  (A copy of the AON Claim Preparation Manual is attached and marked Exhibit 14.)  The Claim Manual was "by" Curtis S. Anderson, CPC Director, Property Claims, whom Ms. Campiglia identified as the national director of all property claims for AON

10

for the United States.  (Claim Preparation Manual, Exh. 14, p. 16; Campiglia Dep., Exh. 13, p.

92, ll. 7-11.)  The Claim Manual stated:  "This manual was prepared to assist you with the

documenting and managing your claim [sic] and facilitating the settlement process."  (Claim

Manual, Exh. 14, p. 1; Campiglia Dep., Exh. 13, p. 86, ll. 11-25; p. 87, ll. 2-86.)  The Claim

Manual also stated that it "was developed by AON Risk Services' claims specialists as a guide

for understanding the fundamentals of preparing a claim and a review of the fundamentals of

property and business interruption insurance."  (Claim Manual, Exh. 14, p. 1; Campiglia Dep.,

Exh. 13, p. 87, ll. 7-25; p. 89, ll. 2-8.)  The Claim Manual contained a "GLOSSARY," which

included a definition of contingent business interruption.  (Claim Manual, Exh. 14, p. 17;

Campiglia Dep. Exh. 13, p. 93, ll. 1-8.)  The definition stated:

> **Contingent Business Interruption** – policy form covering the loss of earnings/
> income in the event of damage to the property of a supplier or receive [sic] of
> materials/services that prevents the insured from conducting normal operations
> (the *supplier*/receiver *cannot be owned or a subsidiary of the insured party*).

(Claim Manual, Exh. 14, p. 17) (emphasis added); Campiglia Dep. Exh. 13, p. 43, ll. 9-25.)  Ms.

Campiglia agreed with the basic principle that, for contingent business interruption coverage, the

supplier cannot be a subsidiary of the insured.  (Campiglia Dep. Exh. 13, p. 95, ll. 2-6.)

Mr. David Passman is the Director of Property Claims for AON and manages the Eastern

Division of the National Property Claims Group.  (Passman Dep., p. 3, ll. 9-10; p. 4, l. 25; p. 5,

ll. 2-16.  A copy of select pages of the deposition of Mr. David Passman is attached and marked

Exhibit 15.)  Among the services provided by the property claims group was to assist an insured,

such as Park, in analyzing coverage and preparing and presenting a claim.  (Passman Dep., Exh.

15, p. 5, ll. 17-25; p. 6, ll. 2-14.)  Mr. Passman identified his specialty as coverage interpretation

of property policies.  (Passman Dep., Exh. 15, p. 6, ll. 21-25; p. 7, ll. 2-5.)

11

Mr. Passman was also familiar with the Claim Manual.  (Passman Dep., Exh. 15, p. 52, ll. 2-7.)  He agreed that the Claim Manual was developed by AON as a guide for an insured to understand the fundamentals of preparing a claim and to review fundamentals of property and business interruption insurance.  (Passman Dep., Exh. 15, p. 54, ll. 3-12.)  Mr. Passman agreed with the definition of contingent business interruption set forth in the Glossary of the Claim Manual, including the portion stating that the supplier cannot be owned by or be a subsidiary of the insured.  (Passman Dep., Exh. 15, p. 56, ll. 18-25, p. 57, ll. 2-24.)

Mr. Passman identified Paula Campiglia as the person at AON handling the property claims for Park and Krishna Bandyopahdy as the person from AON who placed the Policy with Continental.  (Passman Dep., Exh. 15, p. 22; ll. 2-25; p. 23, ll. 2-9.)  Ms. Bandyopahdy sent Mr. Passman a memo dated March 5, 2003 relating to Park's claim.  (A copy of the March 5, 2003 memo is attached and marked Exhibit 17.)  In this memo, Ms. Bandyopahdy pointed out that Neltec, the Singapore location where the physical damage occurred, was owned by Park.  (March 5, 2003 memo, Exh. 12; Passman Dep., Exh. 15, p. 31, ll. 22-25; p. 32, ll. 2-16, 22; p. 33, ll. 3-6, 19-25; p. 34, ll. 2-3.)  Mr. Passman stated that owning the location where the loss occurred was significant because that meant the location was *not* a non-owned supplier.  (Passman Dep., Exh. 15, p. 34, ll. 4-12.)  Mr. Passman then stated that the traditional understanding in the insurance industry was that contingent business interruption coverage applies only when the supplier is not owned by the insured.  (Passman Dep., Exh. 15, p. 35, ll. 20-25; p. 36, ll. 2-9, 15-25; p. 37, ll. 2-3.)

Ms. Bandyopahdy testified that she advised Mr. Passman that the Singapore location, where the loss occurred, was owned by Park.  She did this to let Mr. Passman know the Singapore location was not a third-party supplier; rather, it was owned by Park.  (Bandyopahdy

12

Dep., Exh. 4, p. 82, ll. 17-25; p. 83, ll. 2-8.)  She felt it was important that Mr. Passman and the people from AON handling the claim know this in interpreting the Policy and in letting her know if there was coverage.  (Bandyopahdy Dep., Exh. 4, p. 83, ll. 14-23; p. 84, ll. 2-4, 13-15.)  She stated that, based on her review of the Policy, she felt a question existed about the claim being covered.  (Bandyopahdy Dep., Exh. 4, p. 84, ll. 16-23; p. 92, ll. 20-23; p. 93, ll. 6-15; p. 94, ll. 9-23.)

Mr. Loughlin, AON's account executive for Park, sent an e-mail, dated September 22, 2003, to Mr. Kevin Mitchell, Park's risk manager.  (A copy of the September 22, 2003 e-mail is attached and marked Exhibit 16.)  In this e-mail, he explained that he had spoken to Ms. Campiglia and she had explained that she had reviewed the Policy issued to Park and had found that coverage for interdependent sales was provided only when the policy was endorsed with specific "interdependency sales coverage," which was a supplemental coverage.  (September 22, 2003 e-mail, Exhibit 16; Loughlin Dep., Exh. 12, p. 78, ll. 2-25.)  Mr. Loughlin was told by Ms. Campiglia that the Policy did not have this type of endorsement.  (Loughlin Dep., Exh. 12, p. 79, ll. 2-24.)  Mr. Loughlin learned from Krishna Bandyopahdy that Park never reported interdependency sales to Continental.  (September 22, 2003 e-mail, Exh. 16; Loughlin Dep., Exh. 12, p. 80, ll. 2-12.)  In the e-mail, Mr. Loughlin declared:  "In the absence of this supplemental coverage and the fact that interdependency sales were never reported to CNA will make a case for coverage difficult at best."  (September 22, 2003 e-mail, Exh. 16; Loughlin Dep., Exh. 12, p. 80, ll. 13-20.)

Lastly, Mr. Loughlin stated that he understood contingent business interruption coverage to refer to a loss the insured sustained, i.e., its downtime, because of damage done to a *third-party*, such as a supplier.  (Loughlin Dep., Exh. 12, p. 100, ll. 15-24.)

## III.   ARGUMENT

### A.   The Loss Took Place In Singapore, Outside of the Territorial Limit Covered Under the Policy

The first enumerated condition of the General Conditions of the Policy [4] related to "TERRITORIAL LIMITS" and stated: "The coverage territory is *The United States of America*, including its territories and possessions, and Canada." (Policy, Exh. 3, II. General Conditions, 1., p. 7.) (Emphasis added.) The physical loss occurred at Nelco's facility in Singapore, which was not within the territorial limit covered by the Policy. [5] There is no question on this point.

The case, *United States Lines Co. v. Eastburn Marine Chemical Co.*, 221 F. Supp. 881 (S.D.N.Y. 1963), dealt with a territorial limit in an insurance policy. In that case, an American ship was damaged while anchored at a port in Spain. *Id.* at 82. The insurance policy in question provided:

> POLICY PERIOD TERRITORY. This policy applies only to accidents which occur during the policy period within the United States of America, its territories or possessions, or Canada.

*Id.* The court was called upon to interpret the phrase "within the United States of America, its territories or possessions." The court stated that its interpretation rested on the ordinary meaning of that phrase. *Id.* at 885. The court concluded that the ordinary meaning of the phrase did not include an accident occurring on a ship berthed in Spain. *Id.* Additionally, the court stated that the phrase "within the United States of America, its territories or possessions" was not ambiguous and obviously presented a territorial definition. *Id.*

---

[4] Section IV, "Coverage" of the Policy, where the Contingent Business Interruption provision was located, stated it was subject to "all other policy provisions". (Policy, Exh. 3, IV. A., p. 16.)

[5] Park, as the insured, has the burden of proving that the loss occurred within the Policy's territorial limit. *DNA Plant Technology Corp. v. Navigators Ins. Co.*, 941 F.Supp. 42-45 (D.N.J. 1996).

14

In *Seitlin & Co. v. Doebler*, 489 So. 2d 1200 (Fla. App. 1996), the defendant, a construction contractor, purchased a policy of insurance from Hartford that only protected against losses occurring "in the United States of America, its territories or possessions, or Canada." *Id.* at 1201. A fire loss occurred at a construction site at a military facility in the Portuguese Azores Islands, and Hartford denied the claim on the ground that the loss occurred outside of the area covered under the policy. *Id.* Relying on *Eastburn, supra*, the court in *Seitlin* stated that the phrase "within the United States of America, its territories or possession" was a territorial definition, and the territorial meaning was the ordinary meaning of the phrase. *Id.* at 1202. *See also, Karen Tscheme v. Nationwide Mutual Insurance Co.*, 2003 Ohio App. Lexis 5558, **1-3 (Auto policy with territorial limits applying to "Canada, the United States of America and its territories or possessions, or between their ports" was not vague and was "written in the plainest English;" therefore, there was no coverage for an auto accident in Belgium.); *Tel-Tru Manufacturing Co., Inc. v. North River Insurance Co.*, 90 A.D. 2d 670, 456 N.Y.S. 2d 287, 288 (App. Div. 1982) (The insured manufactured thermometers and shipped them to England, where a loss occurred; the court held that the policy's territory provision was clear and unambiguous, and the loss occurred outside the policy territory.); *Rydman v. Martinolich Shipbuilding Corp.*, 13 Wash. App. 150, 534 P.2d 62, 64 (1975) (The court found the geographical limitation within a builder's risk policy to be unambiguous and the policy's coverage terminated outside of that geographical area.) *Bulk Pack, Inc. v. Fidelity & Deposit Co. of Maryland*, 163 Fed. Appx. 298, 299-01 (5th Cir. 2006) (A commercial crime insurance policy, covering acts of employee dishonesty, had a territorial limit, requiring the acts or events to occur within the United States of America, U.S. Virgin Islands, Puerto Rico, Canal Zone, or Canada;

15

the court found the policy clear and unambiguous, and, thus, acts of embezzlement in Mexico were not covered, even though funds were transferred from a bank account in Louisiana.)

The "Territorial Limits" of the Policy is clear and identifies the relevant *coverage territory*, for the matter at hand, as the United States.  (Policy, II. General Conditions, 1., p. 7.) The plain reading of this provision, shows that here, where the property loss occurred in Singapore, which is not in the United States, the loss occurred outside of the coverage territory.

Moreover, the Policy contained a Schedule of Locations, listing 15 locations, all of which were in the United States, including the facilities for Neltec in Tempe, Arizona.  Ms. Bandyopadhy, the person from AON who placed the property insurance coverage for Park, submitted the Property Specification to Continental on which she indicated the "Territory" as "The United States of America."  (Property Specifications, Exh. 6.)  In so doing, she sought coverage for Park's U.S. operations.  Therefore, any loss, to be covered, by her own testimony, had to occur within the United States.  (Bandyopathy Dep., Exh. 4, p. 55, ll. 6-21; p. 56, ll. 1-3, 5.)

Consistent with the Property Specification received from AON, Continental prepared "PROPERTY SUBMISSION/WORK ORDER," identifying the Territory as "Domestic." (Property Submission, Exh. 7.)

Mr. Jim Butridge, Continental's underwriter for the Policy, testified that the property damage had to occur within the territorial limits stated in the Policy.  Again, the property damage here – the explosion at Nelco's facility in Singapore – did not occur within the territorial limit of the United States, its territories, or Canada.  Along these lines, Mr. Butridge specifically testified that the physical damage *and* any interruption of business must occur within the territorial limit of the policy.

16

Mr. Hunger, who handled Park's claim for Continental, testified that, for contingent business interruption coverage to apply, the loss had to occur in the United States, its territories or Canada.  Since the loss occurred in Singapore, no coverage was afforded.  Notably, Mr. Hunger, in his letter to Park dated September 23, 2003, specifically identified the "Territorial Limits" provision as a reason why Park's contingent business interruption claim may not be covered under the Policy.

AON's manager for the Park account, Mr. Andrew Loughlin, stated that, after Park made its claim, he spoke with Ms. Bandyopahdy, who told him that the Policy provided domestic coverage.  He understood this to mean the Policy only covered loss for Park's U.S. operations.  Because the loss occurred in Singapore, Mr. Loughlin felt the claim may not be covered.  He also determined, through his discussions with Ms. Bandyopahdy, that Park did not submit any business interruption values or limits with regard to the Singapore location.  This too might impact coverage, and, given the Territorial Limit, he felt the property loss in Singapore might not be covered.

The Policy set bounds for the coverage territory, and those bounds were the United States, its territory and possessions, and Canada.  Accordingly, the loss, both the physical property loss and the loss of income, had to be in that territory.  Continental was simply not insuring locations or risks located outside of that territory.  Since the property loss here occurred in Singapore, and not in the United States, no coverage is afforded under the Policy.  As a result, Continental, as a matter of law, is entitled to summary judgment.

**B.     For Contingent Business Interruption Coverage to Apply,
the "Supplier" Cannot be a Subsidiary of the Insured**

Contingent business interruption coverage is a way for an insured to protect itself from losses resulting from interruption of its own business caused by an interruption of the flow

17

of goods from a supplier.  P.Tarr, Where Have All The Customers Gone?  The Brief, Winter 2001, 28.  The "contingent" business, such as a supplier, is a business that is not owned, operated or controlled by the insured.  *Id.*  According to one authority, "[c]ontingent business interruption insurance coverage applies to business interruption losses caused by physical loss or damage to property of the insured's suppliers and/or customers, *as opposed to the insured's own property*."  A.Miller, 719 PLI/LIT 341, 352 (2005).  A distinct characteristic of this type of insurance is that the risk of insured physical damage rests with the insured's suppliers and/or customers who have no contractual relationship with the insurer.  *Id.*

Another treatise explains contingent business interruption insurance as follows.  An insured may wish to protect its business against business interruption loss caused by physical damage to a premises not owned, occupied, operated or controlled.  1 Stephen A. Cozen, Insuring Real Property, § 3.03[2] p. 3-73 (2004).  "These must be properties that are not owned, operated or controlled by the insured; contingent business interruption coverage is not available if the other property is a branch, department or subsidiary or sister business of the insured.  *Id. at 3-76.*

Several recent cases are in accord.  The Second Circuit, in *Zurich American Insurance Co. v. ABM Industries, Inc.*, 397 F. 3d 158 (2nd Cir. 2005), stated that an insured may purchase contingent business interruption coverage when its income may be disrupted by damage to *third-party property. Id.* at 168.  In *CH Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of Louisiana, Inc.*, 918 S.2d 1060 (2005), the court recognized that "[c]ontingent business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to property that the insured does not own, operate, or control." *Id.* at 1061, n.1.

18

There is no dispute that the property loss occurred in Singapore at Nelco, a subsidiary of Park, and that Nelco was providing prepreg material to Neltec, another subsidiary of Park. Because the loss occurred at an owned location, i.e., a subsidiary of Park, the claim, according to Continental's underwriter, Mr. Butridge, was really one for business interruption, not contingent business interruption.  Mr. Butridge contrasted a business interruption claim from a contingent business interruption claim, stating that a contingent interruption claim involved loss at a premises not owned or controlled by the insured.  Mr. Butridge stated that this understanding of contingent business interruption was commonly recognized in the insurance industry. Significantly, when Mr. Butridge met with Park's risk manager and Ms. Bandyopadhy of AON to discuss the placement of the Continental property policy, he brought up that Park would need business interruption coverage for its foreign and American exposures.  He was informed, however, that he did not have to look into providing business interruption coverage for Park's foreign locations because those exposures were adequately covered.

Mr. Hunger, who handled the claim for Continental, pointed out, in his September 23, 2003 letter to Park, that the Policy may not cover the claim because it arose from physical damage at a location owned by the insured, i.e., a Park subsidiary, and he noted that contingent business interruption is not intended to cover "losses resulting from such interdependencies". (September 23, 2003 letter, Exh. 10, p. 3.), In another letter to Park, this one dated June 16, 2004 (Exh. 11), he reiterated that its loss did not appear covered for the reasons stated in his September 23, 2003 letter.  Further, Mr. Hunger testified that, for contingent business interruption, a subsidiary of the insured is not a direct supplier to another subsidiary of the insured.  Mr. Hunger too felt this view was well-understood in the insurance industry.

19

Ms. Paula Campiglia, who handled Park's claim for AON, stated that she was familiar with contingent business interruption losses, and she recognized that contingent business interruption involved a loss to someone other than the insured, which then caused the insured to suffer a business interruption loss.  Furthermore, AON prepared the Claim Manual (prepared by Curtis S. Anderson, AON's National Director of Property Claims) to help its insureds understand the fundamentals of property and business interruption insurance.  The Claim Manual specifically stated that, for contingent business interruption, *a supplier cannot be owned by or a subsidiary of the insured.*  (Exh. 14, p. 17.)  Ms. Campiglia agreed with this basic principle.  So too did Mr. David Passman, AON's Director of Property Claims.  He understood that, in the insurance industry, contingent business interruption coverage only applied only when a supplier was not owned by an insured.  Mr. Andrew Loughlin, AON's Account Executive, also understood that contingent business interruption coverage related to a loss an insured sustained because of damage to a third-party, such as a supplier.

After AON received Park's claim, Ms. Bandyopahdy sent Mr. Passman a memo, pointing out that Nelco, the location in Singapore where the loss occurred, was owned by Park.  According to Mr. Passman, that was significant because the loss would have occurred at an owned location.  Ms. Bandyopahdy testified that she let Mr. Passman know that the Singapore location was an owned location because she felt that was important for Mr. Passman, and the others at AON handling the claim, to know in determining  whether there was coverage.  In her own mind, a question existed about whether the claim was covered.

Mr. Loughlin also questioned coverage.  In fact, he spoke with Ms. Campiglia about the claim and found out that Park did not report sales from an interdependent location and did not

get coverage under the Policy for interdependent sales.  Once he learned this, Mr. Loughlin declared in an e-mail to Park's risk manager that a case for coverage was "difficult at best."

Park's contingent business interruption claim involves property damage at one of Park's subsidiaries (Nelco) allegedly causing loss of income at another one of Park's subsidiaries (Neltec).  Based on the above authority, the expressed understanding of representatives of Continental (Mr. Butridge and Mr. Hunger) and of representatives of AON, Park's broker (Ms. Campiglia, Mr. Passman, and Mr. Loughlin), and the explicit statement in AON's Claim Manual, Park's claim is not properly one for contingent business interruption.  Therefore, the contingent business interruption provision in the Policy does not respond.

## IV.   CONCLUSION

No coverage is afforded for the contingent business interruption claim of Park and Neltec.  This is for two reasons.  First, the loss occurred in Singapore, which is outside of the United States and, therefore, outside of the specified territorial limits of the Policy.  Second, Nelco and Neltec are both subsidiaries of Park, meaning that an owned, related company to Park and Neltec, and not a third-party, suffered the property damage, giving rise to the contingent business interruption claim.  Such a setup – insured subsidiary to insured subsidiary – is not proper for contingent business interruption insurance.

Since there is no question of material fact, summary judgment, as a matter of law, should be entered in favor of Continental and against Park, and Park's and Neltec's Complaint should be dismissed with prejudice.

21

James M. Hoey
James R. Swinehart
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Charles J. Rocco
CLAUSEN MILLER P.C.
One Chase Manhattan Plaza, 39th Floor
New York, NY  10005
Firm I.D. No. 90181
212/805-3900

Attorneys for Defendant Continental Casualty
Company

22