# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

PARK ELECTROCHEMICAL CORP.    )
and NELTEC, INC.,    )
    )
        Plaintiff(s)    )
    vs.    )    No. CV 04-4916
    )
CONTINENTAL CASUALTY    )
COMPANY,    )
        Defendant.    )

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Continental Casualty Company, by and through its attorneys, Clausen Miller, P.C., presents the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1.    Neltec is a wholly owned subsidiary of Park. (Complaint, Exh. 1, Introductory Paragraph.)

2.    Neltec sells a line of electronic materials, known as N6000, to customers in the electronics industry, which then manufacture multilayer printed circuit boards and interconnected systems. (Complaint, Exh. 1, ¶¶1-2.)

3.    Neltec obtained prepreg, a component of the N6000 line of materials, from Nelco Products Pte., Ltd. ("Nelco"). Nelco is another wholly owned subsidiary of Park. (Complaint, Exh. 1, ¶¶ 2-3.)

4.    Neltec is located in Tempe, Arizona. (Complaint, Exh. 1, ¶¶ 10, 16, 20.)

5.    Nelco is located in Singapore. (Complaint, Exh. 1, 3; Park's Answer to Interrogatory No. 2.)

6.    On November 27, 2002, an explosion occurred in a treater at Nelco's facility in

Singapore. (Complaint, Exh. 1, ¶ 5.)

7.    The treater was the equipment in which the prepreg was manufactured. (Complaint, Exh. 1, ¶ 4.)

8.    Nelco's facility in Singapore was separately insured by Royal & SunAlliance Insurance (Singapore), Ltd. ("Royal"). Nelco made a claim with Royal and has been paid $7,392,634. (Park's Answers to Interrogatory Nos. 15-16, Exh. 2.)

9.    Park was the named insured under a property policy, No. RMP 210728811 ("Policy"), issued by Continental. (Policy, Exh. 3.)

10.    As to the "Named Insured," the Policy provided:

| 1. NAMED INSURED | PARK ELECTROCHEMICAL CORPORATION<br>5 Dakota Drive<br>Lake Success, NY 11042 |
|---|---|

and its ***subsidiary or affiliated companies*** as of the date hereof.

\*        \*        \*

(Policy, Exh. 3, I., ¶ 1.) (Emphasis in original.)

11.    The Policy contained the following condition:

### 1. TERRITORIAL LIMITS

The coverage territory is The United States of America, including its territories and possessions, and Canada.

(Policy, II. General Conditions, 1. p. 7.)

12.    The Policy also contained a Schedule of Locations, listing 15 locations, all located in the United States, including the facilities for Neltec at 1420 and 1444 W. 12th Place in Tempe, Arizona. (Policy, Exh. 3, Schedule of Locations and Limits, Form L1000.)

13.    AON Risk Services ("AON") served as Park's broker for the placement of the

2

Policy with Continental. (Park's Answer to Interrogatory No. 6, Exh. 2; Bandyopadhy Dep., Exh. 4, p. 6, ll. 4-11; p. 16., ll. 9-22.)

14.     The person from AON who placed the property insurance coverage for Park was Ms. Krishna Bandyopadhy. (Bandyopadhy Dep, Exh. 4, p. 6, ll. 1-21; p. 7, ll. 3-7; p. 16., ll. 9-22; p. 18, ll. 2-7.)

15.     Ms. Bandyopahdy sent Mr. Bill Griffin of CNA a letter dated January 6, 2002, asking CNA to look at the Park account and give a proposal for property insurance. (Bandyopadhy Dep, Exh. 4, p. 50, ll. 21-25; p. 51, ll. 1-6.)

16.     Enclosed with the January 6, 2002 letter was a Property Specification, which Ms. Bandyopahdy prepared. (Bandyopadhy Dep., Exh. 4, p. 53, ll. 7-20; January 6, 2002 letter is Exh. 5; Property Specification, Exh. 6.)

17.     On the Property Specification, for the category "Territory," Ms. Bandyopahdy indicated the "United States of America". (Property Specification, Exh. 6; Bandyopandy Dep, Exh. 4, p. 55, ll. 14-21.)

18.     Neither Park nor its broker AON requested that Continental cover locations outside of the United States. (Answer to Interrogatory No. 5, Exh. 2.)

19.     Continental prepared a document entitled "PROPERTY SUBMISSION/ WORK ORDER," dated May 29, 2002, that identified the Territory as "Domestic." (Property Submission/Work Order, Exhibit 7.)

20.     The underwriter for Continental for the Policy was Mr. Jim Butridge. (Butridge Dep., Exh. 8, p. 3, ll. 8-10; p. 20, ll. 9-11.)

21.     Mr. Greg Hunger, who is employed by Continental as a Senior General Adjuster, handled the claim submitted by Park. (Hunger Dep., Exh. 9, p. 6, ll. 13-21; p. 15, ll. 18-22; p.

3

17, ll. 13-24; p. 58, ll. 9-17; p. 59, ll. 14-16.)

     22.     Mr. Hunger, in a letter dated September 23, 2003, sent a reservation of rights letter to Mr. Murray Stamer of Park, in which Mr. Hunger identified reasons why the contingent business interruption claim of Park may not be covered.  (September 23, 2003 letter, Exh. 10.)

     23.     Mr. Hunger in his September 23, 2003 letter, quoted the "Territorial Limits" provision set forth in the General Conditions of the Policy.  (September 23, 2003 letter, Exh. 10, p. 1.)

     24.     In his September 23, 2003 letter, Mr. Hunger stated that:  ". . . the Nelco Products Pte., Ltd. facility, which is located in Singapore, is outside of the coverage territory specified in the policy." (September 23, 2003 letter, Exh. 10, p. 3.)

     25.     In another letter from Mr. Hunger, this one dated June 16, 2004, and sent to Mr. Kevin Mitchell, the Risk Manager for Park, Mr. Hunger referred back to his September 23, 2003 letter and stated that the issues identified in that letter were still valid.  He added that, per that letter, the loss did not appear to be covered.  (June 16, 2004 letter, Exh. 11.)

     26.     Andrew Loughlin is a Vice President of AON in the property and casualty risk management group.  (Loughlin Dep., p. 3, ll. 9-10; p. 5, ll. 7-14.  Loughlin Dep., Exh. 12.)

     27.     In 2003, he began working on the Park account for AON as the account manager. (Loughlin Dep., Exh. 12, p. 22, ll. 5-12, 23-25.)

     28.     As the account manager, he was the person who had primary contact with Park. (Loughlin Dep., Exh. 12, p. 24, ll. 3-10.)

     29.     Mr. Loughlin identified Krishna Bandyopahdy as the person from AON primarily involved with the placement of the property policy with Continental.  (Loughlin Dep., Exh. 12, p.28, ll. 17-24; p. 29, ll. 23-27.)

30. After Park's insurance claim came in, Mr. Loughlin discussed it with Ms. Bandyopahdy and discussed whether the Policy provided coverage. (Loughlin Dep., Exh. 12, p. 47, ll. 3-9, 14-16; p. 48, ll. 13-18.)

31. One of the things Mr. Loughlin and Ms. Bandyopahdy discussed was whether the Policy provided domestic coverage only. (Loughlin Dep., Exh. 12, p. 48, ll. 19-23.)

32. He also discussed with Ms. Bandyopahdy the business interruption values submitted by Park in placing coverage with Continental. (Loughlin Dep., Exh. 12, p. 51, ll. 22-25.)

33. Mr. Loughlin determined that no exposures, business interruption values, or limits were reported with regard to the Singapore location. (Loughlin Dep., Exh. 12, p. 52, ll. 2-20.)

34. Mr. Loughlin discussed with Ms. Bandyopahdy that all the Park locations identified in the Policy were U.S. locations. (Loughlin Dep., Exh. 12, p. 53, ll. 2-18.)

35. The Policy provided:

**1.     CONTINGENT BUSINESS INTERRUPTION**

Subject to the sublimit specified in Section **I.4.** of this policy, the Company will pay for the loss resulting from necessary interruption of business conducted at **Locations** occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:

**a.**     any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured; or

**b.**     any real or personal property of direct customers to whom the Insured's product(s) is shipped, which wholly or partially prevents the acceptance of said product(s).

(Policy, Exh. 3, IV. A. 3., p. 18.) (Emphasis in original.)

5

36. Section IV. Coverage, where the Contingent Business Interruption provision was found in the Policy, was subject to "all other policy provisions". (Policy, Exh. 3, IV. A., p. 16.)

37. Mr. Butridge had a meeting with Park's risk manager and the broker from AON, Krishna Bandyopahdy, on March 28, 2002. (Butridge Dep., Exh. 8, p. 20, ll. 9-22; p. 21, ll. 2 - 11.)

38. At the meeting, Mr. Butridge discussed the need for business interruption (not contingent business interruption) coverage for Park's foreign and American exposures. (Butridge Dep., Exh. 8, p. 23, ll. 15-24; p. 24, l.1.)

39. At the meeting, Mr. Butridge asked whether he should look into covering the foreign locations. He was informed by Park's risk manager not to because the foreign exposures were adequately covered. (Butridge Dep., Exh. 8, p. 23, ll. 15-24; p. 24, l. 1.)

40. Mr. Butridge mentioned that there could be a gap in coverage because Park had two separate policies for the owned locations (the foreign and the domestic). Nevertheless, the risk manager said he felt adequately covered and did not want Mr. Butridge to respond to the foreign locations. (Butridge Dep., Exh. 8, p. 24, ll. 1-5.)

41. Ms. Paula Campiglia was the person from AON, who primarily worked on Park's claim. (Campiglia Deposition, Exh. 13, p. 47, ll. 11-13.)

42. AON gave a Claim Preparation Manual ("Claim Manual") to insureds as a guideline on what to do in the event of a loss. Here, Ms. Campiglia supplied the Claim Manual to Park's risk manager, Kevin Mitchell. (Campiglia Dep., Exh. 13, p. 84, ll. 19-25; p. 85, ll. 2-25; p. 86, ll. 11-14.) (AON Claim Preparation Manual, Exh. 14.)

43. The Claim Manual was "by" Curtis S. Anderson, CPC Director, Property Claims. (Claim Preparation Manual, Exh. 14, p. 16; Campiglia Dep., Exh. 13, p. 92, ll. 7-11.)

6

44.     The Claim Manual stated: "This manual was prepared to assist you with the documenting and managing your claim [sic] and facilitating the settlement process." (Claim Manual, Exh. 14, p. 1; Campiglia Dep., Exh. 13, p. 86, ll. 11-25; p. 87, ll. 2-86.)

45.     The Claim Manual also stated that it "was developed by AON Risk Services' claims specialists as a guide for understanding the fundamentals of preparing a claim and a review of the fundamentals of property and business interruption insurance." (Claim Manual, Exh. 14, p. 1; Campiglia Dep., Exh. 13, p. 87, ll. 7-25; p. 89, ll. 2-8.)

46.     The Claim Manual contained a "GLOSSARY," which included a definition of contingent business interruption. (Claim Manual, Exh. 14, p. 17; Campiglia Dep., Exh. 13, p. 93, ll. 1-8.) The definition stated:

> **Contingent Business Interruption** – policy form covering the loss of earnings/ income in the event of damage to the property of a supplier or receive [sic] of materials/services that prevents the insured from conducting normal operations (*the supplier/receiver cannot be owned or a subsidiary of the insured party*).

(Claim Manual, Exh. 14, p. 17) (emphasis added); Campiglia Dep., Exh. 13, p. 93, ll. 9-25.)

47.     Mr. David Passman is the Director of Property Claims for AON and manages the Eastern Division of the National Property Claims Group. (Passman Dep., Exh. 15, p. 3, ll. 9-10; p. 4, l. 25; p. 5, ll. 2-16.)

48.     Among the services provided by the Property Claims Group was to assist an insured, such as Park, in analyzing coverage and preparing and presenting a claim. (Passman Dep., Exh. 15, p. 5, ll. 17-25; p. 6, ll. 2-14.)

49.     Ms. Bandyopahdy sent Mr. Passman a memo dated March 5, 2003 relating to Park's claim. (March 5, 2003 memo, Exh. 17.)

50.     In this memo, Mr. Bandyopahdy pointed out that Neltec, the Singapore location where the physical damage occurred, was owned by Park. (March 5, 2003 memo, Exh. 17;

7

Passman Dep., Exh. 15, p. 31, ll. 22-25; p. 32, ll. 2-16, 22; p. 33, ll. 3-6, 19-25; p. 34, ll. 2-3.)

51.     Mr. Loughlin, AON's account executive for Park, sent an e-mail, dated September 22, 2003, to Mr. Kevin Mitchell, Park's risk manager. (September 22, 2003 e-mail, Exh. 16.)

52.     In this e-mail, Mr. Loughlin explained that he had spoken to Ms. Campiglia and she had explained that she had reviewed the Policy issued to Park and had found that coverage for interdependent sales was provided only when the policy was endorsed with specific "interdependency sales coverage," which was a supplemental coverage. (September 22, 2003 e-mail, Exhibit 16; Loughlin Dep., Exh. 12, p. 78, ll. 2-25.)

53.     Mr. Loughlin was told by Ms. Campiglia that the Policy did not have this type of endorsement. (Loughlin Dep., Exh. 12, p. 79, ll. 2-24.)

54.     Mr. Loughlin learned from Krishna Bandyopahdy that Park never reported interdependency sales to Continental. (September 22, 2003 e-mail, Exh. 16; Loughlin Dep., Exh. 12, p. 80, ll. 2-12.)

55.     In the e-mail, Mr. Loughlin declared: "In the absence of this supplemental coverage and the fact that interdependency sales were never reported to CNA will make a case for coverage difficult at best." (September 22, 2003 e-mail, Exh. 17; Loughlin Dep., Exh. 12, p. 80, ll. 13-20.)

56.     Mr. Hunger in his letter of September 23, 2003 quoted the "Contingent Business Interruption" provision of the Policy. (September 23, 2003 letter, Exh. 10, pp. 1-2.)

57.     Mr. Hunger, in this September 23, 2003, stated that:

> Additionally, Nelco Products Pte, Ltd. may not be a "direct supplier" within the meaning of the Contingent Business Interruption coverage of the policy. The intent of the policy is not to provide. Contingent Business Interruption coverage for losses arising from physical damage at locations

8

owned by the insured nor for losses resulting from such interdependencies. Nelco Products Pte., Ltd. appears to be a subsidiary of Park Electrochemical Corporation. Your September 17, 2003 letter refers to Nelco Products Pte., Ltd. as an affiliated company.

(September 23, 2003 letter, Exh. 10, p. 3.)

James M. Hoey
James R. Swinehart
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Charles J. Rocco
CLAUSEN MILLER P.C.
One Chase Manhattan Plaza, 39th Floor
New York, NY 10005
Firm I.D. No. 90181
212/805-3900

Attorneys for Defendant Continental Casualty Company

1078208.1