UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PARK ELECTROCHEMICAL CORP. and          )
NELTEC, INC.,                            )
                                         )
                    Plaintiff(s)         )          No. CV 04-4916
                                         )
          vs.                            )
                                         )
CONTINENTAL CASUALTY COMPANY,            )
                                         )
                    Defendant.           )
                                         )


**PLAINTIFFS' OPPOSITION TO CONTINENTAL CASUALTY COMPANY'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

ARGUMENT ............................................................................................ 7

I.    NELTEC'S LOSS OF BUSINESS INCOME TOOK PLACE AT A SCHEDULED LOCATION WITHIN THE COVERAGE TERRITORY OF THE CNA POLICY AND THUS THE COURT SHOULD DENY CNA'S MOTION FOR SUMMARY JUDGMENT ........................................................................................ 7

II.    THE CNA POLICY DOES NOT REQUIRE AS A CONDITION OF COVERAGE THAT THE "DIRECT SUPPLIER" BE A NON-OWNED ENTITY ........................ 13

# TABLE OF AUTHORITIES

## CASES

2619 Realty, LLC v. Fidelity & Guar. Ins. Co.,
  303 A.D.2d 299, 756 N.Y.S.2d 564 (1st Dept. 2003)........................................... 17

Alfin, Inc. v. Pacific Ins. Co.,
  735 F. Supp. 115 (S.D.N.Y. 1990) ..................................................................... 12

Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
  757 F.2d 523 (2d Cir. 1985)................................................................................ 15

Brandt Corp. v. City of New York,
  14 N.Y.2d 217, 199 N.E.2d 493, 250 N.Y.S.2d 407 (1964) ................................ 15

Breed v. Insurance Co. of N. Am.,
  46 N.Y.2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978) .................... 9, 14, 17

CII Carbon, L.L.C. v. National Union Fire Ins. Co. of Louisiana, Inc.,
  918 So. 2d 1060 (4th Cir. 2005) ......................................................................... 16

Champion Int'l Corp. v. Continental Cas. Co.,
  400 F. Supp. 978 (S.D.N.Y. 1975), aff'd on other grounds, 546 F.2d 502
  (2d Cir. 1976)..................................................................................................... 10

Chiquita Int'l Ltd. v. Liverpool & London S.S. Protection & Indem. Ass'n Ltd.,
  124 F. Supp. 2d 158 (S.D.N.Y. 2000) ................................................................ 12

Croce v. Kurnit,
  737 F.2d 229 (2d Cir.1984)................................................................................. 15

D'Angelo v. Blue Cross & Blue Shield of Central New York,
  252 A.D.2d 886, 676 N.Y.S.2d 315 (3rd Dept. 1998) ......................................... 13

De Paolo v. Leatherstocking Co-op. Ins. Co.,
  256 A.D.2d 879, 681 N.Y.S.2d 686 (3d Dept. 1998).......................................... 13

Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.,
  962 F.2d 268 (2d Cir.1992)................................................................................. 10

Great N. Ins. Co. v. Dayco Corp.,
  637 F. Supp. 765 (S.D.N.Y. 1986) ..................................................................... 16

Hartford Acc. & Indem. Co. v. Wesolowski,
  33 N.Y.2d 169, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973) .......................... 12, 13

Hartol Prods. Corp. v. Prudential Ins. Co. of America,
    290 N.Y. 44, 47 N.E.2d 687 (1943) ................................................................ 17

In re Matter of Metropolitan Prop. & Cas. Ins. Co. v. Mancuso,
    93 N.Y.2d 487, 715 N.E.2d 107, 693 N.Y.S.2d 81 (1999) ................................. 12

Moshiko, Inc. v. Seiger & Smith, Inc.,
    137 A.D.2d 170, 529 N.Y.S.2d 284 (1st Dept. 1988)................................... 9, 14

Northwest Agr. Co-op. Ass'n, Inc. v. Continental Ins. Co.,
    769 P.2d 218 (Or. App. 1989).......................................................................... 17

Primavera v. Rose & Kiernan, Inc.,
    248 A.D.2d 842, 670 N.Y.S.2d 223 (3rd Dept., 1998) ..................................... 13

Royal Ins. Co. of Am. v. Lexington Ins. Co.,
    2004 WL. 1620877 (S.D.N.Y. July 20, 2004)..................................................... 10

Royal Sun Alliance Ins. Co. v. Travelers Ins. Co.,
    15 A.D.3d 563, 791 N.Y.S.2d 117 (2d Dept. 2005).............................................. 10

Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,
    7 F.3d 1091 (2d Cir. 1993)................................................................................ 10

State of New York v. Home Indem. Co.,
    66 N.Y.2d 669, 486 N.E.2d 827, 495 N.Y.S.2d 969 (1985) ........................... 9, 14

Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.,
    34 N.Y.2d 356, 314 N.E.2d 37, 357 N.Y.S.2d 705  (1974) ...................... 9, 10, 14

Tierra Properties v. A.I. Lloyd's Ins. Co.,
    206 A.D.2d 288, 614 N.Y.S.2d 518 (1st Dept. 1994).......................................... 13

Uniroyal, Inc. v. Home Ins. Co.,
    707 F. Supp. 1368 (E.D.N.Y. 1988) ................................................................... 12

United States Fid. & Guar. Co. v. Annunziata,
    67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790 (1986) ....................... 9, 14

Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger,
    423 F.3d 145 (2d Cir. 2005)............................................................................... 10

Western Union Telegraph Co.,
    299 N.Y. 177, 86 N.E.2d 162 (1949) ................................................................ 15

Zurich American Insurance Co. v. ABM Industries, Inc.,
    397 F.3d 158 (2d Cir. 2005)............................................................................ 16

## STATUTES

68A N.Y. Jur. 2d Insurance § 775 ........................................................................ 12

Plaintiffs Park Electrochemical Corp. ("Park") and its wholly-owned subsidiary, Neltec, Inc. ("Neltec"), respectfully submit this Memorandum of Law in Opposition to Defendant Continental Casualty Company's ("CNA") Motion for Summary Judgment.

## PRELIMINARY STATEMENT

CNA's Motion for Summary Judgment ("CNA's Motion") essentially asks the Court to determine whether Neltec is entitled to insurance coverage under the insurance policy that CNA *wishes* it had sold to Park, urging the Court to read into the CNA Policy words and meanings that simply are not there. As unequivocally demonstrated in Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion"), and below, Neltec's claim for contingent business income loss clearly is covered under the plain meaning of the unambiguous language that CNA actually included within the four corners of the CNA Policy. The Court need look no further than that to deny CNA's Motion for summary judgment, and grant Plaintiffs' Motion for Partial Summary Judgment.[1]

Ignoring the actual policy language, and its clear and obvious meaning, CNA urges the Court to consider "evidence" of the "common understanding" in the insurance industry of the scope of contingent business interruption insurance coverage and, based upon that evidence, to deprive Neltec of insurance coverage for the claim at issue. Consideration of this extrinsic evidence is improper under New York law, which

---

[1] Plaintiffs Park and Neltec incorporate by reference herein their Motion for Partial Summary Judgment, dated September 8, 2006 ("Plaintiffs' Motion"), including the Affidavit of Jean M. Farrell, sworn to September 8, 2006 ("Farrell Sept. 8 Aff.") and exhibits attached thereto.

dictates that unambiguous insurance policy language is to be construed in accordance with its ordinary meaning, and extrinsic evidence cannot be admitted to vary or contradict that meaning.

Even if the Court properly could consider such evidence, moreover, the particular "evidence" (as well as case law) that CNA relies upon plainly is irrelevant. While CNA's evidence addresses the *type* of insurance coverage at issue here – contingent business interruption insurance -- it bears no relationship at all to the specific insurance language drafted by CNA and included in the CNA Policy sold to Park. The policy language analyzed in the treatises, claims manuals and cases cited by CNA is materially different than the language CNA chose to include in the CNA Policy.

At best, CNA's extrinsic evidence may establish that the CNA Policy is ambiguous with respect to coverage for contingent business interruption claims like Neltec's. Where policy language is ambiguous, and the extrinsic evidence does not clearly establish the parties' mutual intent with respect to the particular issue, then the policy language should be construed in favor of the policyholder, and against the drafter of the insurance policy. At a minimum, CNA's evidence raises issue of fact which should be resolved by a jury, thus precluding summary judgment in CNA's favor.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference their Statement of Undisputed Material Facts in their Motion for Partial Summary Judgment, dated September 8, 2006. Plaintiffs believe that those facts establish that the CNA Policy language is clear and unambiguous on its face, and that it therefore is unnecessary and improper for the Court to consider extrinsic evidence outside the four corners of the CNA Policy to determine coverage for Neltec's claim. Should the Court consider CNA's extrinsic

evidence, however, Plaintiffs submit that the Court also should consider contrary evidence, ignored by CNA, which challenges CNA's position with respect to the scope of the CNA Policy's coverage for Neltec's claim:

### Territorial Limits Defense

Paula Campiglia of Aon Risk Services ("Aon"), who was primarily responsible for handling Neltec's claim for contingent business interruption insurance, testified that the "Territorial Limits" provision in the CNA Policy did not preclude coverage for Neltec's claim, because the "loss location" for purposes of the claim was Arizona, where the *effects* of the Arizona explosion were felt:

> Q: What do you mean by loss location?
>
> A: This was the location that was impacted, that was losing the earnings because of the explosion in Singapore.

Deposition of Paula Ann Campiglia, dated February 28, 2006 ("Campiglia Dep.") at 42. (Pertinent excerpts of Ms. Campiglia's deposition are attached to the Affidavit of Jean M. Farrell, sworn to October 24, 2006 ("Farrell Aff."), at Exhibit A).

Ms. Campiglia further testified that she was not "concerned about the Singapore location "[b]ecause the location that was affected was in Tempe, Arizona, and that was within the coverage territory," Campiglia Dep. at 64, Farrell Aff., Ex. A, and that "it was [her] opinion that coverage should be provided under the coverage territory because the location that was impacted was a listed location and within the coverage territories." Campiglia Dep. at 67 -68, Farrell Aff., Ex. A.

### "Direct Supplier" Defense

Ms. Campiglia testified that, although it is common in the industry for insurance companies to limit coverage for contingent business interruption coverage to

losses caused by property damage at a non-owned direct supplier, the CNA policy *did not include* any such limiting language. Ms. Campiglia explained that it is critical to look at each individual policy and its specific definitions when interpreting coverage, rather than to look to "industry custom and practice" because "each policy is different":

> Q: Did you have a question in your mind as to whether someone may have been a direct supplier with regard to this claim?
>
> A: Each policy is very specific with definitions. Each company has different definitions, whatever. And the first thing you do is check coverage and check definitions. And, yes, it was, you know, an alert that there was no definition of what a direct supplier was.

Campiglia Dep. at 57, Farrell Aff., Ex. A. David Passman, also an Aon witness presented similar testimony regarding the necessity of reviewing specific policy language to determine coverage:

> Q: [W]ith regard to any property loss, would you agree that what is and is not covered may differ by the policy language and policy form sold?
>
> A: Yes, I would agree with that statement.

Deposition of David Passman, dated February 28, 2006 ("Passman Dep.") at 65-66. (Pertinent excerpts of the Passman Dep. are attached to the Farrell Aff. at Ex. B).

Ms. Campiglia's review of the specific wording of the CNA Policy revealed that there was no definition of direct supplier, and no exclusionary language limiting coverage where there was an ownership relationship between supplier and receiver. Campiglia Dep. at 69, Farrell Aff., Ex. A ("There was nothing in the policy defining what a direct supplier was, nor was there any exclusionary language."). Based upon this review, Ms. Campiglia determined that there should be coverage for Neltec's claim under the contingent business interruption provisions of the CNA Policy:

> Q: What did you say to Mr. Kelley on this issue about direct supplier?
>
> A: I told him that there was no definition in the policy, that there was nothing exclusionary about it could not be a subsidiary of the insured. And that as far as I was concerned, it would fall into – it would have to fall into contingent business interruption because of the lack of wording.

Campiglia Dep. at 72, Farrell Aff., Ex. A; See also Campiglia Dep. at 74, Farrell Aff., Ex. A ("[I]n the absence of a definition of direct supplier, I still felt that we had a good shot of going under contingent BI coverage."). She believed that without a definition of "direct supplier" or other limiting language, the CNA Policy was at least ambiguous with respect to the scope of coverage:

> . . . there was no definition in the CNA policy about what a direct supplier was, that the policy was ambiguous and open to interpretation.

Campiglia Dep. at 56, Farrell Aff., Ex. A.

CNA also relies heavily on a Claim Preparation Manual provided to Park by Aon,[2] relying upon the definition of "contingent business interruption" contained therein, which states that "the supplier/receiver cannot be owned or a subsidiary of the insured party." CNA asserts that Ms. Campiglia agreed with this "basic principle." CNA Motion at 11. CNA failed to mention, however, that Ms. Campiglia offered extensive testimony disagreeing that the Claim Preparation Manual was relevant to an analysis of coverage under the CNA Policy. Ms. Campiglia made quite clear her understanding that the Aon manual stated general principles *only*, and that the only way to understand what a *particular individual policy* covers is to look at the specific policy's definition. In

---

[2]     The Claim Preparation Manual was provided to Park on September 16, 2003, however, which was after the loss, and thus has no bearing on the party's *mutual* intent with respect to coverage for the Neltec claim. CNA's Motion, Ex. 13, at 85.

this case, the CNA Policy does not include a definition similar to the one in the Aon manual, and thus, Ms. Campiglia testified, the policy is *at least ambiguous* as to whether it provides contingent business interruption coverage where the supplier is an owned entity. Campiglia Dep. at 56, Farrell Aff., Ex. A.

Ms. Bandypadhy, another Aon employee, also testified that it was her belief that, based upon the wording of the CNA policy, there was at least an ambiguity as to whether there was "interdependency coverage" in the policy:

> Q: Was interdependency coverage provided on the Continental Casualty Company policy?
>
> A: There was ambiguity in the wording. There was interdependency coverage in the policy, yes.
>
> Q: There was not?
>
> A: There was.
>
> Q: Okay. How was that?
>
> A: Under business interruption coverage.
>
> Q: Would that be contingent business interruption coverage?
>
> A: Yes.
>
> Q: Was there any provision actually designated as interdependency coverage?
>
> A: Not that I recall.

Deposition of Krishna Bandyopadhy, dated March 1, 2006, Farrell Aff., Ex. C.

Mr. Passman agreed that there could be interdependency coverage in an insurance policy even without a specific provision for such coverage:

> A: It is my opinion under certain wordings of a policy, under certain programs that are set up, we might have coverage for, quote, unquote, interdependency, whether there was an interdependency clause in the policy or not.

Passman Dep. at 35, Farrell Aff., Ex. B. Mr. Passman went on to explain that one of the situations in which there may be interdependency coverage even without an interdependency clause is where "a local policy was issued for regulatory purpose, but interdependency was intended to be picked up by the domestic policy." Passman Dep. at 38, Farrell Aff., Ex. B. Here, Nelco, the Singapore supplier, purchased a separate insurance policy from Royal & Sun Alliance to cover losses at the Singapore facility. CNA's Motion at 3.

## ARGUMENT

I.  **NELTEC'S LOSS OF BUSINESS INCOME TOOK PLACE AT A SCHEDULED LOCATION WITHIN THE COVERAGE TERRITORY OF THE CNA POLICY AND THUS THE COURT SHOULD DENY CNA'S MOTION FOR SUMMARY JUDGMENT**

CNA deliberately distorts Neltec's claim for insurance coverage, and completely disregards the clear language of the Contingent Business Interruption coverage provision, in an attempt to create a coverage defense where there is none. The basis for CNA's Motion is its assertion that "the physical loss occurred at Nelco's facility in Singapore, which was not within the territorial limits covered by the Policy," CNA's Motion at 14, and that "[t]he plain reading of [the Territorial Limits] provision, shows that here, where the property loss occurred in Singapore, which is not in the United States, the loss occurred outside of the coverage territory." CNA's Motion at 16. Neltec does not seek coverage for the "physical loss" at the Nelco treater in Singapore. Indeed, contrary to CNA's description of Neltec's claim, Neltec does not seek from CNA coverage for "property loss" at all. As CNA well knows, Nelco purchased a separate insurance policy from Royal and Sun Alliance to cover any direct physical damage at the Singapore facility. The only "loss" for which Neltec seeks insurance coverage is its

loss of *business income* which resulted from the physical damage in Singapore. This loss clearly took place at Nelco's Scheduled Location in Tempe, Arizona, which clearly is within the coverage territory of the CNA Policy.

CNA simply ignores the language of the Contingent Business Interruption provision, which imposes no territorial limitations on the "physical damage" component of a claim:

> The Company will pay for <u>loss resulting from necessary interruption of business conducted at Locations occupied by the insured</u> and covered in this policy, caused by direct physical damage or destruction to:
>
> a. any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured.

Farrell Sept. 8 Aff., Exh. E at 18 (emphasis added). Here, the "loss" insured resulted from a necessary interruption of business conducted at the Arizona location occupied by Neltec.

Reading the "Territorial Limits" provision and the "Contingent Business Interruption" provisions together, it is clear that the fact that the treater was located in Singapore is irrelevant. The only reasonable reading of the CNA Policy is that, as long as the *loss of business income* takes place in a covered Location, the loss is covered. There is no further requirement, stated anywhere in the CNA Policy, that the "direct physical damage or destruction" which causes the loss must *also* take place at a covered Location. And because Neltec is only seeking *coverage* for losses within the United States, the requirements of the "Territorial Limits" provision also are satisfied. Indeed, as discussed in Plaintiffs' Motion, at 10, CNA *acknowledged* that the real loss at issue was the loss of income, and not the property damage, and questioned whether

the "territorial limits" policy provision had any applicability at all in this situation. Plaintiffs' Motion at 10, Farrell Sept. 8 Aff., Ex. G.

Despite the clear policy language, CNA argues that the "loss of income" *and* the physical damage that causes it must take place within the "coverage territory" of the United States. CNA's sole support for this argument is testimony of James Butridge, an Aon underwriter, and Greg Hunger, a CNA claims-handler. *See* CNA's Motion at 5-6.[3] Consideration of this testimony, which is directly contrary to the language of the CNA Policy (and in Mr. Hunger's case, inconsistent with other testimony), is improper under New York law.

It is black-letter New York law that "[w]here the provision of an insurance policy are clear, the contract must be enforced as written." *Moshiko, Inc. v. Seiger & Smith, Inc.*, 137 A.D.2d 170, 174, 529 N.Y.S.2d 284, 287 (1st Dep't 1988). *See also State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 486 N.E.2d 827, 495 N.Y.S.2d 969 (1985); *Breed v. Insurance Co. of N. Am.*, 46 N.Y. 2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978); *United States Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790 (1986) (holding that clear and unambiguous terms should be understood in their plain, ordinary, popular and non-technical sense); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37, 357 N.Y.S.2d 705

---

[3]     CNA also cites a number of cases addressing "territorial limits" provisions. *See* CNA's Motion at 15. The cited cases are irrelevant however, and offer no support for CNA's position. All the cases stand for is the unremarkable, and undisputed by Neltec, proposition that, when the coverage territory of an insurance policy is the United States, claims for property damage that takes place outside of the United States are not covered. Neltec is not making a claim for property damage. None of the cases cited address claims for contingent business interruption where the property damage took place outside the United States, but the loss of business income took place in the United States.

(1974) (insurance policy provisions should be given the meaning of "an ordinary business man in applying for insurance and reading the language of the policies when submitted.")

The Court must apply unambiguous policy language based solely on the language within the four corners of the policy, without consideration of any extrinsic evidence. *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272 (2d Cir.1992) (holding that "[i]f a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature."). *See also Royal Sun Alliance Ins. Co. v. Travelers Ins. Co.*, 15 A.D.3d 563, 564, 791 N.Y.S.2d 117, 118 (2d Dept. 2005); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094-95 (2d Cir. 1993); *Royal Ins. Co. of Am. v. Lexington Ins. Co.*, No. 02 CIV 2085, 2004 WL 1620877, *2 (S.D.N.Y. July 20, 2004) (holding that "when language in a contract is clear, the court must construe the contract and grant summary judgment without reference to extrinsic evidence."); *Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145 (2d Cir. 2005) (holding that "if contract is unambiguous on its face, parties' rights under such contract should be determined solely by terms expressed in instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.").[4]

---

[4]    The "reasonable expectations" doctrine, a rule of policy construction applied by New York courts, also dictates that summary judgment be denied to CNA, and partial summary judgment granted to Park. The "reasonable expectations" doctrine "provides that if a policy can be reasonably construed in favor of the position asserted by the insured, he is entitled to recover." *Champion Int'l Corp. v. Continental Cas. Co.*, 400 F. Supp. 978, 980 (S.D.N.Y. 1975), *aff'd on other grounds*, 546 F.2d 502 (2d Cir. 1976).

The CNA Policy thus should be given its ordinary meaning, and partial summary judgment on this defense granted in Park's favor. Only if the Court determines that the CNA Policy language is ambiguous *on its face, without resort to extrinsic evidence* would it be proper to consider the testimony of Mr. Butridge and Mr. Hunger. If the Court is inclined to consider this evidence, however, it should also consider the testimony of Paula Campiglia, also of Aon. She testified that "it was [her] opinion that coverage should be provided under the coverage territory because the location that was impacted was a listed location and within the coverage territories." Campiglia Dep. at 67 -68, Farrell Aff., Ex. A. It should also consider the contemporaneous writings in CNA's claims files discussing coverage for this loss which make clear that CNA understood that the Location of the loss was Tempe, Arizona — *not* Singapore, the location of the physical damage to the Dependent Property — and questioned the application of the Territorial Limitation to this claim:

> Loss Local[e] [sic]: Actual loss is in Singapore. Contingent loss arises from Tempe, AZ location....
>
> * * *
>
> Singapore is not within the specified territorial limit. Of concern as well is that the language for Contingent BINT does not specify a territorial limitation for "...direct suppliers, which wholly or partially prevents the delivery of materials to the insured". Does General Conditions-Territorial Limits apply overall? <u>The actual loss occurred outside territorial Limits. The Contingent loss is occurring within Territorial Limits.</u>

Large Loss Hot Line, dated March 27, 2003 (CCL 000010-13), Farrell Sept. 8 Aff., Ex. G (emphasis added).

At most, the conflicting testimony demonstrates that there may be an ambiguity with respect to the scope of the "Territorial Limits" provision. Because there

is no conclusive evidence demonstrating that CNA's reading of the policy is the correct one – let alone that it was mutually shared, prior to the loss, by Neltec -- the Court should construe the provision in Neltec's favor. *Chiquita Int'l Ltd. v. Liverpool & London S.S. Protection & Indem. Ass'n Ltd.*, 124 F. Supp. 2d 158, 164 (S.D.N.Y. 2000) (applying New York law; holding that if extrinsic evidence is inconclusive, the court should apply the interpretative rule that ambiguities in a contract are ordinarily construed against the drafter); *Alfin, Inc. v. Pacific Ins. Co.*, 735 F. Supp. 115, 118 (S.D.N.Y. 1990) (quoting *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1372–78 (E.D.N.Y. 1988) ("[t]he proper resolution under federal procedure and New York law is that summary judgment is proper on an ambiguous insurance policy when, after having allowed full discovery and found no valuable extrinsic evidence of the parties' intent, the court applies as a last resort the state law presumption construing the policy against the insurer."). *See also In re Matter of Metropolitan Prop. & Cas. Ins. Co. v. Mancuso,* 93 N.Y.2d 487, 497, 715 N.E.2d 107, 693 N.Y.S.2d 81 (1999) (Court of Appeals held that "[w]hen an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier") (citations omitted).

In any case, even if the Court declines to grant summary judgment to Neltec, summary judgment in CNA's favor on this policy provision is inappropriate. At a minimum, the extrinsic evidence cited by CNA raises issues of fact, which precludes summary judgment. Indeed, resolution of ambiguity generally is a question of fact for the jury. 68A N.Y. Jur. 2d Insurance § 775. *See also Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909, 350 N.Y.S.2d 895, 898 (1973)

(jury question raised when the "determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence"); *De Paolo v. Leatherstocking Co-op. Ins. Co.*, 256 A.D.2d 879, 681 N.Y.S.2d 686 (3d Dep't 1998) (noting generally when summary judgment is appropriate); *Tierra Properties v. A.I. Lloyd's Ins. Co.*, 206 A.D.2d 288, 614 N.Y.S.2d 518, 519 (1st Dep't 1994) (ambiguity creates an issue of fact); *Hartford Acc. & Ind. Co. v. Wesolowski*, 33 N.Y.2d 169, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973); *D'Angelo v. Blue Cross & Blue Shield of Central New York*, 252 A.D.2d 886, 676 N.Y.S.2d 315 (3rd Dept. 1998); and *Primavera v. Rose & Kiernan, Inc.*, 248 A.D.2d 842, 670 N.Y.S.2d 223 (3rd Dept., 1998).

## II.  THE CNA POLICY DOES NOT REQUIRE AS A CONDITION OF COVERAGE THAT THE "DIRECT SUPPLIER" BE A NON-OWNED ENTITY

The CNA Policy specifically provides, in pertinent part, that

the Company will pay for loss resulting from necessary interruption of business conducted at ___**Locations**___ occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:

a.  <u>any</u> real or personal property of direct suppliers.

Farrell Sept. 8 Aff., Ex. E (emphasis added).  Contingent Business Interruption coverage is designed to insure a policyholder for loss of income in the policyholder's operations caused by physical loss to or destruction of "contributing" (supplier) or "recipient" (customer) locations.  *See, e.g.* Alan R. Miller, *Business Interruption Insurance for Damage to Other Property*, FICC Q., Vol. 53, Issue 3 (Apr. 1, 2003) (holding that "[c]ontingent business interruption insurance protects the earnings of the

insured following physical loss or damage to the property of the insured's suppliers and. or customers" ).  Farrell Sept. 8 Aff., Ex. S.

CNA has asserted that the Contingent Business Interruption provision in the CNA Policy does not provide coverage for Neltec's loss of business income in this case because "direct supplier" in the policy provision refers *only* to *non-owned* entities. CNA asserts that because Nelco is a wholly-owned subsidiary of Park, there can be no coverage for this claim.  Farrell Sept. 8 Aff., Ex. A.  "Direct supplier" is not defined in the CNA Policy, nor is there any indication anywhere in the CNA Policy that "direct supplier" refers only to entities not related to or owned by the policyholder.

Where a term is undefined, the court must look to the plain meaning of the undefined terms, and interpret them in the way that an ordinary person would.  *Moshiko, Inc. v. Seiger & Smith, Inc.*, 137 A.D.2d 170, 174, 529 N.Y.S.2d 284, 287 (1st Dep't 1988).  *See also State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 486 N.E.2d 827, 495 N.Y.S.2d 969 (1985); *Breed v. Insurance Co. of N. Am.*, 46 N.Y. 2d 351, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978); *United States Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 492 N.E.2d 1206, 501 N.Y.S.2d 790 (1986); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37, 357 N.Y.S.2d 705 (1974) (holding that undefined terms should be given the meaning of "an ordinary business man in applying for insurance and reading the language of the policies when submitted.").  It is hard to conceive of any ordinary person understanding the two words "direct supplier," standing alone, to mean "suppliers who are not owned by the policyholder," just as it is hard to understand how, if this was actually CNA's intent, it did not add this short phrase to the policy it drafted.

CNA ignores the actual policy language it drafted, however, and presents "evidence" of purported industry "custom and practice" – in the form of treatises, manuals, and self-serving deposition testimony -- that "direct supplier" means a non-owned entity. As discussed above, extrinsic evidence cannot be considered by the court to vary or contradict clear policy language. This rule is particularly applicable when the extrinsic evidence sought to be introduced is evidence not of the mutual intent of the parties, but of custom and practice in the industry. *Brandt Corp. v. City of New York*, 14 N.Y.2d 217, 220, 199 N.E.2d 493, 495, 250 N.Y.S.2d 407, 409 (1964) (holding that "[a]ny custom or practice which might have existed . . . . could not vary rights expressly and clearly provided for by the contract. . . . Nothing short of a modification of the contract, or a waiver of its provisions would avoid" the plain language of the contract.); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (holding that "evidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties"), citing *Croce v. Kurnit*, 737 F.2d 229, 238 (2d Cir.1984) and *Western Union Telegraph Co.*, 299 N.Y. 177, 183, 86 N.E.2d 162, 166 (1949).

Even if the Court considers this "evidence," however, CNA still is not entitled to summary judgment. Much of the "evidence" relied upon by CNA interprets different policy language than the language CNA chose to include in the CNA Policy. For example, CNA relies heavily on the definition of "contingent business interruption" in a "Claim Preparation Manual" provided after the loss to Park by Aon to support its position that it is "known" in the industry that there is no coverage when there is an ownership interest between a supplier and receiver. The Claim Preparation Manual is

irrelevant to any interpretation of the CNA Policy however, because it uses a definition of "contingent business interruption" which *explicitly states* that "the supplier/receiver cannot be owned or a subsidiary of the insured party." CNA Brief at 11. The CNA Policy, which CNA drafted, does not contain any such explicit language. To the contrary, the CNA Policy fails even to address the relationship between the supplier and receiver.[5]

If anything, the contrast between the language in the Claim Preparation Manual and the language CNA chose to include in the CNA Policy supports *Neltec's* position. Comparing the two documents, it is clear that CNA easily could have drafted its policy language to exclude coverage where there was an ownership relationship between the supplier and receiver, yet CNA chose not to do so. Where an insurance company chooses to write an insurance policy one way, when it easily could have written it another, it has to be bound by the terms of the policy *as written*. *See, e.g., Great N. Ins. Co. v. Dayco Corp.*, 637 F. Supp. 765, 780 (S.D.N.Y. 1986) (holding that "[i]f [the insurance company] had intended to exclude a loss where an employee's

---

[5] Likewise, the cases relied upon by CNA in support of its interpretation of the CNA Policy miss the mark. Like the Claim Preparation Manual, they interpret different definitions of Contingent Business Interruption insurance than CNA drafted for use in the CNA Policy. In *Zurich American Insurance Co. v. ABM Industries, Inc.*, 397 F.3d 158 (2d Cir. 2005), for instance, the policy at issue specifically provided that "policy provides extended coverage to actual losses sustained due to the necessary interruption of business as the result of direct physical loss or damage of the type insured against to properties *not operated by the Insured." Id.* at162. Similarly, the insurance policy in *CII Carbon, L.L.C. v. National Union Fire Ins. Co. of Louisiana, Inc.*, 918 So.2d 1060 (4th Cir. 2005), specifically limited contingent business interruption coverage to claims for business interruption caused by "damage to or destruction of any real or personal property . . . not operated by the Insured." *CII Carbon, L.L.C. v. National Union Fire Ins. Co. of Louisiana, Inc. Id.* at 1064. Here, the CNA Policy contains no such limitation, and this Court should refuse to allow CNA to insert language it chose to omit at the point of sale.

dishonest act was only a contributing factor, it could have drafted the exclusion to cover this situation."); *Hartol Prods. Corp. v. Prudential Ins. Co. of America*, 290 N.Y. 44, 49, 47 N.E.2d 687, 690 (1943) (holding that "If [the insurance company]meant to exclude liability . . . why did it not say so in such plain language that a . . . man, though a fool, might not be deceived thereby? It would appear a simple thing for a great institution, such as appellant, to write a clause in its policies exempting itself from such liability in plain and simple language."). CNA should not be permitted to solicit this Court's help to re-write the CNA Policy it sold to Park. *Northwest Agr. Co-op. Ass'n, Inc. v. Continental Ins. Co.*, 769 P.2d 218, 220 (Or. App. 1989) (holding that "If [the insurance company's] had intended to exclude from its specified perils coverage [certain] losses . . . it could have done so easily. . . . [The insurance company's] interpretation of its policy is not so compelling that we are persuaded to add exclusionary language that defendant could have, but did not, put in the policy."). Indeed, "a court is not free to 'make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation.'" *2619 Realty, LLC v. Fidelity & Guar. Ins. Co.*, 303 A.D.2d 299, 301, 756 N.Y.S.2d 564, 566 (1st Dept. 2003), quoting *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (1978).

CNA's other "evidence" of custom and practice in the industry also is distorted and incomplete. For example, CNA asserts that Ms. Campiglia of Aon agreed with the "basic principle" that a supplier cannot be an owned entity for purposes of contingent business income coverage. CNA's Motion at 11. CNA failed, however, to address Ms. Campiglia's extensive testimony disagreeing with CNA that the Claim Preparation Manual is evidence of the scope of coverage under the CNA Policy at issue

in this case. Ms. Campiglia made quite clear her understanding that the Aon Claim Preparation Manual stated general principles *only*, and that the only way to understand what a *particular individual policy* like the CNA Policy covers is to look at that specific policy's definitions. Campiglia Dep. at 57, Farrell Aff., Ex. A. *See also* Passman Dep. at 65-66, Farrell Aff., Ex. B. In this case, the CNA Policy does not include a definition similar to the one in the Aon Claim Preparation Manual, and thus, Ms. Campiglia testified, the CNA Policy is *at least ambiguous* as to whether it provides contingent business interruption coverage where the supplier is an owned entity. Cite Ms. Bandypadhy, another Aon employee, also testified that it was her belief that, based upon the wording of the CNA policy, there was at least an ambiguity as to whether there was "interdependency coverage" in the CNA Policy. Farrell Aff., Ex. C.

A critical distinction, ignored by CNA, between this case and the typical contingent business interruption claim involving interdependent supplier/receivers is that, here, the supplier, Nelco, has separate, independent insurance coverage for the Singapore operation, that separately covered the property damage loss in Singapore. It thus is irrelevant that Park did not supply information regarding "interdependency sales" information with respect to the Nelco facility, a fact that CNA cites as evidence in favor of its defense. CNA's Motion at 13. Because Nelco was independently covered by its own insurance policy, CNA bore no more risk for covering Neltec's contingent business interruption losses related to this entity then it would have for any other non-owned entity. Indeed, David Passman, who CNA identified as an expert in "coverage interpretation," CNA's Motion at 11, testified that it was possible to have "interdependency" coverage, even without a specific endorsement providing such

coverage, where, as here, the interdependent entities have separate insurance coverage:

> A: It is my opinion under certain wordings of a policy, under certain programs that are set up, we might have coverage for, quote, unquote, interdependency, whether there was an interdependency clause in the policy or not.

Passman Dep. at 35, Farrell Aff., Ex. B. Mr. Passman went on to explain that one of the situations in which there may be interdependency coverage even without an interdependency clause is where "a local policy was issued for regulatory purpose, but interdependency was intended to be picked up by the domestic policy." Passman Dep. at 38, Farrell Aff., Ex. B.

At most, the conflicting testimony demonstrates that there may be an ambiguity with respect to the scope of the "Territorial Limits" provision. As discussed above, at 14, because there is no conclusive evidence demonstrating that CNA's reading of the policy is the correct one, the Court should construe the provision in Neltec's favor. In any case, even if the Court declines to grant summary judgment to Park, summary judgment in CNA's favor on this policy provision is inappropriate. As discussed above, at 14-15, resolution of an ambiguity generally is a question of fact for the jury.

Last, CNA's interpretation simply is unreasonable. Despite Mr. Butridge's self-serving and uncorroborated testimony that he discussed coverage for foreign entities with Park, there is no underwriting difference to CNA; the risk it bore was no greater than had Nelco been owned by another company. Permitting it to avoid paying this loss on the basis of an exclusion it chose not to include for a fact in no way affecting

its risk of loss would stand the rules of insurance policy construction on their collective heard.

## CONCLUSION

For all of the foregoing reasons, this Court should deny CNA's Motion for Summary Judgment, and grant Plaintiffs' Motion for Partial Summary Judgment.

Dated: October 6, 2006
(corrected as of October 24, 2006)

ANDERSON KILL & OLICK, P.C.

*Richard P Lewis /s/ rmt*
Richard P. Lewis (RL-2227)
1251 Avenue of the Americas
New York, NY 10020-1182
(212) 278-1000

Attorneys for Plaintiffs Park Electrochemical Corp. and Neltec, Inc.