UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PARK ELECTROCHEMICAL CORP. and
NELTEC, INC.,

         Plaintiff(s)

vs.

CONTINENTAL CASUALTY COMPANY,

         Defendant.

No. CV 04-4916

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, Plaintiffs Park Electrochemical Corp. and Neltec, Inc. (collectively, "Park"), respectfully submit the following response to Defendant Continental Casualty Company's ("CNA") Statement of Undisputed Material Facts in support of its Motion for Summary Judgment:

### RESPONSE TO CNA'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Neltec is a wholly owned subsidiary of Park. (Complaint, Exh. 1, Introductory Paragraph.)

**Admitted.**

2.    Neltec sells a line of electronic materials, known as N6000, to customers in the electronics industry, which then manufacture multilayer printed circuit boards and interconnected systems. (Complaint, Exh. 1, ¶¶1-2.)

**Admitted.**

3. Neltec obtained prepreg, a component of the N6000 line of materials, from Nelco Products Pte., Ltd. ("Nelco"). Nelco is another wholly owned subsidiary of Park. (Complaint, Exh. 1, ¶¶2-3.)

**Admitted.**

4. Neltec is located in Tempe, Arizona. (Complaint, Exh. 1, ¶¶10, 16, 20.)

**Admitted.**

5. Nelco is located in Singapore. (Complaint, Exh. 1, 3; Park's Answer to Interrogatory No. 2.)

**Admitted.**

6. On November 27, 2002, an explosion occurred in a treater at Nelco's facility in Singapore. (Complaint, Exh. 1, ¶ 5.)

**Admitted.**

7. The treater was the equipment in which the prepreg was manufactured. (Complaint, Exh. 1, ¶ 4.)

**Admitted.**

8. Nelco's facility in Singapore was separately insured by Royal & SunAlliance Insurance (Singapore), Ltd. ("Royal"). Nelco made a claim with Royal and has been paid $7,392,634. (Park's Answers to Interrogatory Nos. 15-16, Exh. 2.)

**Admitted.**

9. Park was the named insured under a property policy. No. RMP 210728811 ("Policy"), issued by Continental. (Policy, Exh. 3.)

**Admitted.**

10. As to the "Named Insured," the Policy provided:

        **1. NAMED**      **PARK ELECTROCHEMICAL**
        **INSURED**          **CORPORATION**
                               5 Dakota Drive
                               Lake Success, NY 11042

and its *subsidiary or affiliated companies* as of the date hereof.

\* \* \*

(Policy, Exh. 3, I., ¶ 1.) (Emphasis in original.)

**Admitted.**

11.    The Policy contained the following condition:

        **1.    TERRITORIAL LIMITS**

                The coverage territory is The United States of America, including its territories and possessions, and Canada.

(Policy, II. General Conditions, 1. p. 7.)

**Admitted.**

12.    The Policy also contained a Schedule of Locations, listing 15 locations, all located in the United States, including the facilities for Neltec at 1420 and 1444 W. 12th Place in Tempe, Arizona. (Policy, Exh. 3, Schedule of Locations and Limits, Form L1000.)

**Admitted.**

13.    AON Risk Services ("AON") served as Park's broker for the placement of the Policy with Continental. (Park's Answer to Interrogatory No. 6, Exh. 2; Bandyopadhy Dep., Exh. 4, p. 6, ll. 4-11; p. 16., ll. 9-22.)

**Denied as phrased. Park objects to the characterization that Aon is "Park's broker," but admits that the Policy was brokered by Aon.**

14. The person from AON who placed the property insurance coverage for Park was Ms. Krishna Bandyopadhy. (Bandyopadhy Dep. Exh. 4. p. 6, II. 1-21; p. 7, II. 3-7; p. 16., II. 9-22; p. 18, II. 2-7.)

**Denied as phrased. Park admits that Ms. Krishna Bandyopadhy was a syndicator for Aon, and that she was involved in the placement of the Policy.**

15. Ms. Bandyopadhy sent Mr. Bill Griffin of CNA a letter dated January 6, 2002. asking CNA to look at the Park account and give a proposal for property insurance. (Bandyopadhy Dep. Exh. 4, p. 50, II. 21-25; p. 51, II. 1-6.)

**Admitted.**

16. Enclosed with the January 6, 2002 letter was a Property Specification, which Ms. Bandyopadhy prepared. (Bandyopadhy Dep., Exh. 4, p. 53, II. 7-20; January 6, 2002 letter is Exh. 5; Property Specification, Exh. 6.)

**Admitted that a Property Specification was enclosed with a January 6, 2002 letter, but denied that the cited evidence bears any relevance to this dispute.**

17. On the Property Specification, for the category "Territory," Ms. Bandyopadhy indicated the "United States of America". (Property Specification, Exh. 6; Bandyopadhy Dep. Exh. 4, p. 55, II. 14-21.)

**Admitted that the category "Territory" on the Property Specification indicated the United States of America.**

18. Neither Park nor its broker AON requested that Continental cover locations outside of the United States. (Answer to Interrogatory No. 5, Exh. 2.)

**Denied as phrased because the evidence does not support the statement. Park's Answer to Interrogatory No. 5 stated that Park "is not aware that the specific referenced request was ever made."**

19. Continental prepared a document entitled "PROPERTY SUBMISSION/WORK ORDER," dated May 29, 2002, that identified the Territory as "Domestic." (Property Submission/Work Order, Exhibit 7.)

**Admitted that a document entitled "PROPERTY SUBMISSION/WORK ORDER" dated May 29, 2002, identified the Territory as "Domestic."**

20. The underwriter for Continental for the Policy was Mr. Jim Butridge. (Butridge Dep., Exh. 8, p. 3, ll. 8-10; p. 20, ll. 9-11.)

**Admitted that Mr. Butridge was an underwriter on the Policy.**

21. Mr. Greg Hunger, who is employed by Continental as a Senior General Adjuster, handled the claim submitted by Park. (Hunger Dep., Exh. 9, p. 6, ll. 13-21; p. 15, ll. 18-22; p. 17, ll. 13-24; p. 58, ll. 9-17; p. 59, ll. 14-16.)

**Admitted.**

22. Mr. Hunger, in a letter dated September 23, 2003, sent a reservation of rights letter to Mr. Murray Stamer of Park, in which Mr. Hunger identified reasons why the contingent business interruption claim of Park may not be covered. (September 23, 2003 letter, Exh. 10.)

**Admitted.**

23. Mr. Hunger in his September 23, 2003 letter, quoted the "Territorial Limits" provision set forth in the General Conditions of the Policy. (September 23, 2003 letter, Exh. 10, p. 1.)

**Admitted.**

24. In his September 23, 2003 letter, Mr. Hunger stated that: "... the Nelco Products Pte., Ltd. facility, which is located in Singapore, is outside of the coverage territory specified in the policy." (September 23, 2003 letter, Exh. 10, p. 3.)

**Admitted that CNA accurately quoted the September 23, 2003 letter, but notes that a prior, internal CNA document questioned the applicability of the "Territorial Limits" provision to the Neltec loss, noting "The actual loss occurred outside territorial Limits. The Contingent loss is occurring within Territorial Limits." See Large Loss Hot Line, dated March 27, 2003 (CCL 000010-13), Farrell Sept. 8 Aff., Ex. G.**

25. In another letter from Mr. Hunger, this one dated June 16, 2004, and sent to Mr. Kevin Mitchell, the Risk Manager for Park, Mr. Hunger referred back to his September 23, 2003 letter and stated that the issues identified in that letter were still valid. He added that, per that letter, the loss did not appear to be covered. (June 16, 2004 letter, Exh. 11.)

**Admitted.**

26. Andrew Loughlin is a Vice President of AON in the property and casualty risk management group. (Loughlin Dep., p. 3, ll. 9-10; p. 5, ll. 7-14. Loughlin Dep., Exh. 12.)

**Admitted.**

27. In 2003, he began working on the Park account for AON as the account manager. (Loughlin Dep., Exh. 12, p. 22, ll. 5-12, 23-25.)

**Admitted.**

28. As the account manager, he was the person who had primary contact with Park. (Loughlin Dep., Exh. 12, p. 24, ll. 3-10.)

**Admitted that CNA has accurately summarized the cited deposition testimony.**

29. Mr. Loughlin identified Krishna Bandyopadhy as the person from AON primarily involved with the placement of the property policy with Continental. (Loughlin Dep., Exh. 12, p.28, ll. 17-24; p. 29, ll. 23-27.)

**Admitted that CNA has accurately summarized the cited deposition testimony.**

30. After Park's insurance claim came in, Mr. Loughlin discussed it with Ms. Bandyopadhy and discussed whether the Policy provided coverage. (Loughlin Dep., Exh. 12, p. 47, ll. 3-9, 14-16; p. 48, ll. 13-18.)

**Admitted that CNA has accurately summarized the cited deposition testimony.**

31. One of the things Mr. Loughlin and Ms. Bandyopadhy discussed was whether the Policy provided domestic coverage only. (Laughlin Dep., Exh. 12, p. 48, ll. 19-23.)

**Admitted that CNA has accurately summarized the cited deposition testimony, but denied that this evidence bears any relevance to this dispute.**

32. He also discussed with Ms. Bandyopadhy the business interruption values submitted by Park in placing coverage with Continental. (Loughlin Dep., Exh. 12, p. 51, ll. 22-25.)

**Admitted that CNA has accurately summarized the cited deposition testimony, but denied that this testimony bears any relevance to this dispute.**

33. Mr. Laughlin determined that no exposures, business interruption values, or limits were reported with regard to the Singapore location. (Loughlin Dep., Exh. 12, p. 52, ll. 2-20.)

**Admitted that CNA has accurately summarized the cited deposition testimony, but denied that this testimony bears any relevance to this dispute.**

34. Mr. Laughlin discussed with Ms. Bandyopadhy that all the Park locations identified in the Policy were U.S. locations. (Loughlin Dep., Exh. 12. p. 53, ll. 2-18.)

**Admitted that CNA has accurately summarized the cited deposition testimony, but denied that this testimony bears any relevance to this dispute.**

35. The Policy provided:

> 1. **CONTINGENT BUSINESS INTERRUPTION**
>
>    Subject to the sublimit specified in Section I.4. of this policy, the Company will pay for the loss resulting from necessary interruption of business conducted at **Locations** occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:
>
>    a.  any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured; or
>
>    b.  any real or personal property of direct customers to whom the Insured's product(s) is shipped, which wholly or partially prevents the acceptance of said product(s).

(Policy, Exh. 3, IV. A. 3., p. 18.) (Emphasis in original.)

**Admitted.**

36. Section IV. Coverage, where the Contingent Business Interruption provision was found in the Policy, was subject to "all other policy provisions". (Policy, Exh. 3, IV. A., p. 16.)

**Admitted.**

37. Mr. Butridge had a meeting with Park's risk manager and the broker from AON, Krishna Bandyopadhy, on March 28, 2002. (Butridge Dep., Exh. 8, p. 20, II. 9-22; p. 21, II. 2-11.)

**Admitted that CNA accurately summarized the deposition testimony, but denies knowledge regarding the alleged meeting. Park denies that the testimony bears any relevance to this dispute.**

38. At the meeting, Mr. Butridge discussed the need for business interruption (not contingent business interruption) coverage for Park's foreign and American exposures. (Butridge Dep., Exh. 8, p. 23, II. 15-24; p. 24, I.I.)

**Admitted that CNA accurately summarized the deposition testimony, but denies knowledge regarding the alleged meeting. Park denies that the testimony bears any relevance to this dispute.**

39. At the meeting, Mr. Butridge asked whether he should look into covering the foreign locations. He was informed by Park's risk manager not to because the foreign exposures were adequately covered. (Butridge Dep., Exh. 8, p. 23, II. 15-24; p. 24, I.I.)

**Admitted that CNA accurately summarized the deposition testimony, but denies knowledge regarding the alleged meeting. Park denies that the testimony bears any relevance to this dispute.**

40. Mr. Butridge mentioned that there could be a gap in coverage because Park had two separate policies for the owned locations (the foreign and the domestic). Nevertheless, the risk manager said he felt adequately covered and did not want Mr. Butridge to respond to the foreign locations. (Butridge Dep., Exh. 8, p. 24, ll. 1-5.)

**Admitted that CNA accurately summarized the deposition testimony, but denies knowledge regarding the alleged meeting. Park denies that the testimony bears any relevance to this dispute.**

41. Ms. Paula Campiglia was the person from AON, who primarily worked on Park's claim. (Campiglia Deposition, Exh. 13, p. 47, ll. 11-13.)

**Admitted.**

42. AON gave a Claim Preparation Manual ("Claim Manual") to insureds as a guideline on what to do in the event of a loss. Here, Ms. Campiglia supplied the Claim Manual to Park's risk manager, Kevin Mitchell. (Campiglia Dep., Exh. 13, p. 84, ll. 19-25; p. 85, ll. 2-25; p. 86, ll. 11-14.) (AON Claim Preparation Manual, Exh. 14.)

**Denied as phrased; CNA incompletely summarized Ms. Campiglia's testimony. Ms. Campiglia testified that the manual is "generic" and "not tailored to each specific account." Campiglia Dep., Exh. 13, at 85, ll. 13-17. Admitted that Aon gave a Claim Preparation Manual to Park, but denied that this manual bears any relevance to this case, as it was provided after the loss, and thus has no bearing on Park's intent with respect to coverage under the Policy.**

43. The Claim Manual was "by" Curtis S. Anderson, CPC Director, Property Claims. (Claim Preparation Manual, Exh. 14, p. 16; Campiglia Dep., Exh. 13, p. 92, ll. 7-11.)\

**Admitted.**

44. The Claim Manual stated: "This manual was prepared to assist you with the documenting and managing your claim [sic] and facilitating the settlement process." (Claim Manual, Exh. 14, p. 1; Campiglia Dep., Exh. 13, p.86, II. 11-25; p. 87, II. 2-86.)

**Admitted that CNA accurately quoted the Claim Preparation Manual, but denied that this manual bears any relevance to this case, as it was provided after the loss, and discusses policy language materially different from the policy language CNA chose to include in the Policy. AON Claim Preparation Manual, Exh. 14.**

45. The Claim Manual also stated that it "was developed by AON Risk Services' claims specialists as a guide for understanding the fundamentals of preparing a claim and a review of the fundamentals of property and business interruption insurance." (Claim Manual, Exh. 14, p. 1; Campiglia Dep., Exh. 13, p. 87, II. 7-25; p. 89, II. 2-8.)

**Admitted that CNA accurately quoted the manual, but denied that this manual bears any relevance to this case, as it was provided after the loss, and discusses policy language materially different from the policy language CNA chose to include in the Policy. AON Claim Preparation Manual, Exh. 14.**

46. The Claim Manual contained a "GLOSSARY," which included a definition of contingent business interruption. (Claim Manual, Exh. 14, p. 17; Campiglia Dep., Exh. 13, p. 93, II. 1-8.) The definition stated:

> **Contingent Business Interruption** — policy form covering the loss of earnings/income in the event of damage to the property of a supplier or receive [sic] of materials services that prevents the

insured from conducting normal operations (*the supplier/receiver cannot he owned or a subsidiary of the insured party*).

(Claim Manual, Exh. 14, p. 17) (emphasis added); Campiglia Dep., Exh. 13, p. 93, ll. 9-25.)

**Admitted that CNA accurately quoted the Claim Preparation Manual, but denied that this Claim Preparation Manual bears any relevance to this case, as it was provided after the loss, and discusses policy language materially different from the policy language CNA chose to include in the Policy. AON Claim Manual Exh. 14.**

47. Mr. David Passman is the Director of Property Claims for AON and manages the Eastern Division of the National Property Claims Group. (Passman Dep., Exh. 15, p. 3, ll. 9-10; p.4, l. 25; p. 5, ll. 2-16.)

**Admitted.**

48. Among the services provided by the Property Claims Group was to assist an insured, such as Park, in analyzing coverage and preparing and presenting a claim. (Passman Dep., Exh. 15, p. 5, ll. 17-25; p. 6, ll. 2-14.)

**Admitted.**

49. Ms. Bandyopadhy sent Mr. Passman a memo dated March 5, 2003 relating to Park's claim. (March 5, 2003 memo, Exh. 17.)

**Admitted.**

50. In this memo, Mr. Bandyopadhy pointed out that Neltec, the Singapore location where the physical damage occurred, was owned by Park. (March 5, 2003 memo, Exh. 17; Passman Dep., Exh. 15, p. 31, ll. 22-25; p. 32, ll. 2-16, 22; p. 33, ll. 3-6, 19-25; p. 34, ll. 2-3.)

**Admitted, but denied that this evidence bears any relevance to this dispute.**

51. Mr. Loughlin, AON's account executive for Park, sent an e-mail, dated September 22, 2003, to Mr. Kevin Mitchell, Park's risk manager. (September 22, 2003 e-mail, Exh. 16.)

**Admitted.**

52. In this e-mail, Mr. Loughlin explained that he had spoken to Ms. Campiglia and she had explained that she had reviewed the Policy issued to Park and had found that coverage for interdependent sales was provided only when the policy was endorsed with specific "interdependency sales coverage," which was a supplemental coverage. (September 22, 2003 email, Exhibit 16; Loughlin Dep., Exh. 12, p. 78, ll. 2-25.)

**Admitted that CNA accurately summarized the cited e-mail.**

53. Mr. Loughlin was told by Ms. Campiglia that the Policy did not have this type of endorsement. (Loughlin Dep., Exh. 12, p. 79, ll. 2-24.)

**Admitted that CNA accurately summarized the deposition testimony, but denies sufficient knowledge to determine the accuracy of the statement.**

54. Mr. Loughlin learned from Krishna Bandyopadhy that Park never reported interdependency sales to Continental. (September 22, 2003 e-mail, Exh. 16; Loughlin Dep., Exh. 12, p. 80, ll. 2-12.)

**Admitted that CNA accurately summarized the cited e-mail, but denied that this evidence bears any relevance to this dispute.**

55. In the e-mail, Mr. Loughlin declared: "In the absence of this supplemental coverage and the fact that interdependency sales were never reported to CNA will make

a case for coverage difficult at best." (September 22, 2003 e-mail, Exh. 17; Loughlin Dep., Exh. 12, p. 80, ll. 13-20.)

**Admitted that CNA accurately quoted the cited e-mail but denies that the statement is correct. Additionally, Park objects to CNA's attempt to transform Mr. Loughlin's understanding into incontrovertible fact.**

56. Mr. Hunger in his letter of September 23, 2003 quoted the "Contingent Business Interruption" provision of the Policy. (September 23, 2003 letter, Exh. 10, pp. 1-2.)

**Admitted.**

57. Mr. Hunger, in this September 23, 2003, stated that:

> Additionally, Nelco Products Pte, Ltd. may not be a "direct supplier" within the meaning of the Contingent Business Interruption coverage of the policy. The intent of the policy is not to provide. Contingent Business Interruption coverage for losses arising from physical damage at locations owned by the insured nor for losses resulting from such interdependencies.

**Admitted that CNA accurately quoted Mr. Hunger's September 23, 2003 letter, but denied that the quoted statement is accurate. Additionally, Park objects to CNA's attempt to transform Mr. Hunger's understanding into incontrovertible facts.**

## PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS

1. Paula Campiglia of Aon Risk Services ("Aon") testified that the "Territorial Limits" provision in the CNA Policy did not preclude coverage for Neltec's claim, because the "loss location" for purposes of the claim was Arizona, where the *effects* of the Arizona explosion were felt:

> Q: What do you mean by loss location?

> A: This was the location that was impacted, that was losing the
> earnings because of the explosion in Singapore.

Deposition of Paula Ann Campiglia, dated February 28, 2006 ("Campiglia Dep.") at 42. (Pertinent excerpts of Ms. Campiglia's deposition are attached to the Affidavit of Brian Valery, sworn to October 6, 2006 ("Valery Aff."), at Exhibit A).

2.  Ms. Campiglia further testified that she was not "concerned about the Singapore location "[b]ecause the location that was affected was in Tempe, Arizona, and that was within the coverage territory," Campiglia Dep. at 64, Valery Aff., Ex. A, and that "it was [her] opinion that coverage should be provided under the coverage territory because the location that was impacted was a listed location and within the coverage territories." Campiglia Dep. at 67 -68, Valery Aff., Ex. A.

3.  Ms. Campiglia testified that, although it is common in the industry for insurance companies to limit coverage for contingent business interruption coverage to losses caused by property damage at a non-owned direct supplier, the CNA policy *did not include* any such limiting language. Ms. Campiglia explained that it is critical to look at each individual policy and its specific definitions when interpreting coverage, rather than to look to "industry custom and practice" because "each policy is different":

> Q: Did you have a question in your mind as to whether someone may have been a direct supplier with regard to this claim?
>
> A: Each policy is very specific with definitions. Each company has different definitions, whatever. And the first thing you do is check coverage and check definitions. And, yes, it was, you know, an alert that there was no definition of what a direct supplier was.

Campiglia Dep. at 57, Valery Aff., Ex. A.

4.  David Passman, also an Aon witness presented similar testimony regarding the necessity of reviewing specific policy language to determine coverage:

> Q: [W]ith regard to any property loss, would you agree that what is and is not covered may differ by the policy language and policy form sold?
>
> A: Yes, I would agree with that statement.

Deposition of David Passman, dated February 28, 2006 ("Passman Dep.") at 65-66. (Pertinent excerpts of the Passman Dep. are attached to the Valery Aff. at Ex. B).

5.  Ms. Campiglia's review of the specific wording of the CNA Policy revealed that there was no definition of direct supplier, and no exclusionary language limiting coverage where there was an ownership relationship between supplier and receiver. Campiglia Dep. at 69, Valery Aff., Ex. A ("There was nothing in the policy defining what a direct supplier was, nor was there any exclusionary language.").

6.  Based upon this review, Ms. Campiglia determined that there should be coverage for Neltec's claim under the contingent business interruption provisions of the CNA Policy:

> Q: What did you say to Mr. Kelley on this issue about direct supplier?
>
> A: I told him that there was no definition in the policy, that there was nothing exclusionary about it could not be a subsidiary of the insured. And that as far as I was concerned, it would fall into – it would have to fall into contingent business interruption because of the lack of wording.

Campiglia Dep. at 72, Valery Aff., Ex. A; See also Campiglia Dep. at 74, Valery Aff., Ex. A ("[I]n the absence of a definition of direct supplier, I still felt that we had a good shot of going under contingent BI coverage.").

7. Ms. Campiglia believed that without a definition of "direct supplier" or other limiting language, the CNA Policy was at least ambiguous with respect to the scope of coverage:

> ... there was no definition in the CNA policy about what a direct supplier was, that the policy was ambiguous and open to interpretation.

Campiglia Dep. at 56, Valery Aff., Ex. A.

8. Ms. Bandypadhy, another Aon employee, also testified that it was her belief that, based upon the wording of the CNA policy, there was at least an ambiguity as to whether there was "interdependency coverage" in the policy:

> Q: Was interdependency coverage provided on the Continental Casualty Company policy?
>
> A: There was ambiguity in the wording. There was interdependency coverage in the policy, yes.
>
> Q: There was not?
>
> A: There was.
>
> Q: Okay. How was that?
>
> A: Under business interruption coverage.
>
> Q: Would that be contingent business interruption coverage?
>
> A: Yes.
>
> Q: Was there any provision actually designated as interdependency coverage?
>
> A: Not that I recall.

Deposition of Krishna Bandyopadhy, dated March 1, 2006, Valery Aff., Ex. C.

9. Mr. Passman agreed that there could be interdependency coverage in an insurance policy even without a specific provision for such coverage:

> A: It is my opinion under certain wordings of a policy, under certain programs that are set up, we might have coverage for, quote, unquote, interdependency, whether there was an interdependency clause in the policy or not.

Passman Dep. at 35, Valery Aff., Ex. B.

10. Mr. Passman went on to explain that one of the situations in which there may be interdependency coverage even without an interdependency clause is where "a local policy was issued for regulatory purpose, but interdependency was intended to be picked up by the domestic policy." Passman Dep. at 38, Valery Aff., Ex. B. Here, Nelco, the Singapore supplier, purchased a separate insurance policy from Royal & Sun Alliance to cover losses at the Singapore facility. CNA's Motion at 3.

Dated: October 6, 2006

ANDERSON KILL & OLICK, P.C.

*Richard Lewis* (signature)

Richard P. Lewis (RL-2227)
1251 Avenue of the Americas
New York, NY 10020-1182
(212) 278-1000

Attorneys for Plaintiffs Park Electrochemical Corp.