ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182
(212) 278-1000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARK ELECTROCHEMICAL CORP. and NELTEC, INC., | : |
| Plaintiffs, | : |
| v. | : Civil No. 04-CV-4916 |
| CONTINENTAL CASUALTY COMPANY, | : |
| Defendant. | : |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
PARTIAL SUMMARY JUDGMENT**

NJDOCS-47994.5

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

UNDISPUTED MATERIAL FACTS .................................................................... 3

    A.   Neltec's Operations ................................................................................ 3

    B.   The Loss .................................................................................................. 3

    C.   The CNA Policy ....................................................................................... 4

    D.   CNA's Multiple, Inconsistent Coverage Positions ................................. 5

ARGUMENT ....................................................................................................... 9

I.     Neltec is entitled to judgment as a matter of law with respect to CNA's coverage defenses ................................................................................. 9

II.    Neltec's loss of business income took place within the coverage territory of the CNA policy and thus cnA's "territorial limit" defense is without merit .................. 10

III.   The CNA policy does not require as a condition of coverage that the "direct supplier" be a non-owned entity ......................................................... 12

CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

## CASES

2619 Realty, LLC v. Fidelity & Guar. Ins. Co.,
   756 N.Y.S.2d 564 (1st Dept. 2003).................................................................. 12

Archer-Daniels-Midland Co. v. Phoenix Assurance Co. of New York,
   936 F. Supp. 534 (S.D.Ill. 1996) ................................................................... 15

Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
   757 F.2d 523 (2d Cir. 1985)......................................................................... 16

Brandt Corp. v. City of New York,
   199 N.E.2d 493 (N.Y. 1964) ......................................................................... 16

Breed v. Insurance Co. of N. Am.,
   385 N.E.2d 1280 (N.Y. 1978) ............................................................. 10, 12, 14

British Int'l. Ins. Co. Ltd. v. Seguros La Republica, S.A.,
   342 F.3d 78 (2d Cir.2003)............................................................................ 16

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ..................................................................................... 9

Croce v. Kurnit,
   737 F.2d 229 (2d Cir.1984).......................................................................... 16

Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.,
   962 F.2d 268 (2d Cir.1992).......................................................................... 13

Great N. Ins. Co. v. Dayco Corp.,
   637 F. Supp. 765 (S.D.N.Y. 1986) ............................................................... 12

Hartol Prods. Corp. v. Prudential Ins. Co.,
   47 N.E.2d 687 (N.Y. 1943) .......................................................................... 12

In re Western Union Telegraph Co.,
   86 N.E.2d 162, 166 (N.Y. 1949) .................................................................. 16

Mazzola v. County of Suffolk,
   533 N.Y.S.2d 297 (2nd Dep't 1988)............................................................. 15

Moshiko, Inc. v. Seiger & Smith, Inc.,
   529 N.Y.S.2d 284 (1st Dep't 1988) ....................................................... 10, 14

Northwest Agr. Co-op. Ass'n, Inc. v. Continental Ins. Co.,
   769 P.2d 218 (Or. App. 1989)...................................................................... 12

Pentair, Inc. v. American Guarantee & Liability Insurance Co., No. Civ. 02-3696,
 2003 WL. 21804874 (D. Minn. July 31, 2003) ............................................. 11, 18

Reuters Ltd. v. Dow Jones Telerate, Inc.,
 662 N.Y.S.2d 450 (1st Dep't 1997) ................................................................... 16

Royal Ins. Co. of America v. Lexington Ins. Co.,
 No. 02 CIV 2085, 2004 WL. 1620877 (S.D.N.Y. July 20, 2004) ......................... 14

Royal Sun Alliance Ins. Co. v. Travelers Ins. Co.,
 791 N.Y.S.2d 117 (2d Dep't 2005)..................................................................... 13

Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,
 7 F.3d 1091 (2d Cir. 1993)................................................................................ 13

Seiden Associates, Inc. v. ANC Holdings, Inc.,
 959 F.2d 425 (2nd Cir. 1992 )............................................................................. 9

State of New York v. Home Indem. Co.,
 486 N.E.2d 827 (N.Y. 1985) ....................................................................... 10, 14

Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.,
 314 N.E.2d 37 (N.Y. 1974) ......................................................................... 11, 14

United States Fid. & Guar. Co. v. Annunziata,
 492 N.E.2d 1206 (N.Y. 1986) ..................................................................... 10, 14

Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger,
 423 F.3d 145 (2d Cir. 2005)............................................................................... 14

## STATUTES

Fed. R. Civ. P. 56(c)............................................................................................... 9

## INTRODUCTION

Plaintiffs Park Electrochemical Corp. and its wholly-owned subsidiary, Neltec, Inc. ("Neltec"), respectfully submit this Memorandum of Law in Support of Their Motion for Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, seeking a declaration that Neltec's Contingent Business Income loss is covered by an all-risk property insurance policy (the "CNA Policy") sold to Park by Defendant Continental Casualty Company ("CNA").

## PRELIMINARY STATEMENT

Park and Neltec bring this motion for partial summary judgment to enforce their entitlement to Contingent Business Interruption insurance coverage under the CNA Policy. The CNA Policy's Contingent Business Interruption insurance protects Park and Neltec from "loss resulting from the necessary interruption of business" "caused by direct physical damage or destruction to" "any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured." While it is the property damage to the supplier's property that *triggers* Contingent Business Interruption coverage, the loss that is *covered* under the policy is the policyholder's loss of income at an insured location that results from that property damage.

Here, as discussed in detail below, Neltec's ability to manufacture and sell one of its products was interrupted when an explosion at a supplier's facility, located in Singapore, prevented that supplier from manufacturing, and Neltec from purchasing, a critical component part of its product, resulting in a loss of income to Neltec. The supplier, Nelco Products Pte., Ltd. ("Nelco"), is a wholly-owned subsidiary of Park, with an entirely separate insurance program under which it was paid for the property

damage caused by the explosion. That program did not cover Neltec's business income loss.

This claim clearly is covered under the plain meaning of the unambiguous language contained within the four corners of the CNA Policy. CNA, however, has steadfastly refused to pay Neltec's claim, and has raised two spurious coverage defenses which it asserts relieves it of its coverage obligations.[1] First, CNA argues that, because the property damage that triggered the loss took place in Singapore – outside the "coverage territory" of the CNA Policy – there is no coverage. CNA also argues that Nelco is not a "direct supplier" within the meaning of the Contingent Business Interruption coverage of the CNA Policy because Nelco is a wholly-owned subsidiary of Park. CNA asserts that there is no coverage for "interdependency" losses – when both supplier and recipient are insured under the same insurance policy. Affidavit of Jean M. Farrell in support of Plaintiffs' Motion for Partial Summary Judgment, sworn to September 8, 2006 (and corrected as of October 24, 2006) ("Farrell Aff."), at Exh. A.

CNA's defenses are without merit, and should be rejected by the Court because there is no language within the four corners of the CNA Policy which (1) requires that the property damage that triggers the loss of income covered by Contingent Business Interruption insurance take place within the territorial limits of the CNA Policy, or (2) prohibits Contingent Business Interruption insurance coverage where there is an ownership interest between the policyholder and the direct supplier.

---

[1] CNA has raised other defenses to Park's claim, including its assertion that there was no financial loss caused by the business interruption. Park believes that CNA's other defenses are without merit, but those are not the subject of this motion for partial summary judgment.

CNA seeks to read into the CNA Policy limitations that simply are not there, and to introduce purported "custom and practice" of the insurance industry to vary the terms of the policy it wrote and sold to Park. This is not permitted under New York law, which dictates that unambiguous insurance policy language is to be construed in accordance with its ordinary meaning, and that extrinsic evidence cannot be admitted to vary or contradict the plain meaning of the policy language. The Court should resist CNA's attempts to rewrite the policy it sold to Park and Neltec, should reject CNA's defenses as a matter of law and grant partial summary judgment to Park and Neltec.

## UNDISPUTED MATERIAL FACTS

### A.    Neltec's Operations

Neltec sells finished materials to customers in the electronics industry who manufacture multilayer printed circuit boards and interconnection systems. One line of materials is the N6000, which Neltec manufactured using another material, called "prepreg," developed specifically for that line and manufactured by Nelco, a wholly-owned subsidiary of Park. Nelco manufactured this prepreg in a specially-modified treater, one of four it operated. Farrell Aff., Exh. B.

### B.    The Loss

An explosion occurred in Nelco's treater on November 27, 2002, resulting in the deaths of two employees, and the total destruction of the treater and eliminating Neltec's only source of prepreg for the manufacture of its N6000 line of materials. *See* Farrell Aff., Exhs. B and C. Neltec's customers' products are specifically designed and constructed to use the N6000 line of materials, and cannot use alternate Neltec materials without costly and time-consuming product and production process design changes. Farrell Aff., Exh. B.

Neltec made a claim for insurance coverage for this loss of income under the CNA Policy and CNA breached the CNA Policy by refusing to pay for Neltec's loss caused by the interruption of its supply of prepreg and its consequent total inability to manufacture its N6000 line of materials. Farrell Aff. Exh. D.

## C. The CNA Policy

The CNA Policy, number RMP210728811, with a policy period of May 30, 2002 through May 30, 2003, is an "all risk" policy, insuring against "all risks of direct physical loss of or damage to property and/or interests described herein." CNA Policy (Farrell Aff., Ex. E) at 16. The CNA Policy provides "Contingent Business Interruption (Gross Earnings)" coverage for "Named Locations" with a sublimit of $10,000,000 and for "Unnamed Locations" with a sublimit of $2,500,000. Farrell Aff., Ex. E at 2.

The CNA Policy attaches a Schedule of Locations, which lists the Neltec location which manufactured the N6000 materials using a component part — prepreg — supplied by Nelco. Farrell Aff., Ex. E at Schedule of Locations and Limits. The Contingent Business Interruption provision thus covers loss at Locations occupied by the insured and covered by the policy: the Location here was that of Neltec, in Tempe, Arizona.

The Contingent Business Interruption provision in the CNA Policy reads as follows:

> Subject to the sublimit specified in Section **I.4.** of this policy, the Company will pay for loss resulting from necessary interruption of business conducted at **_Locations_** occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:
>
> **a.** any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured; or

> **b.** any real or personal property of direct customers to whom the Insured's product(s) is shipped, which wholly or partially prevents the acceptance of said product(s).

Farrell Aff. Exh. E at 18. "Direct suppliers" is not defined in the policy. "Location" is defined to be "[t]he legal premises." Farrell Aff. Exh. E at Amended Glossary Endorsement.

The CNA Policy includes a "Territorial Limits" condition, which provides that "[t]he coverage territory is The United States of America, including its territories and possessions, and Canada." Farrell Aff. Exh. E at 7. Again, the Neltec Location is in Arizona, and, thus, loss at that Location is "covered by the policy."

## D.   CNA's Multiple, Inconsistent Coverage Positions

Neltec gave notice to CNA as soon as it became aware of its loss of business income at the Tempe, Arizona Location, requesting that CNA pay for that loss under the Contingent Business Interruption provision of the CNA Policy. *See* Notice letter, dated March 12, 2003 Farrell Aff., Exh. F. A document in CNA's files discussing coverage for this loss makes clear that CNA understood that the Location of the loss was Tempe, Arizona — *not* Singapore, the location of the physical damage to the Dependent Property — and questioned the application of the Territorial Limitation to this claim:

> Loss Local[e] [sic]: Actual loss is in Singapore. Contingent loss arises from Tempe, AZ location....
>
> * * *
>
> Singapore is not within the specified territorial limit. Of concern as well is that the language for Contingent BINT does not specify a territorial limitation for "...direct suppliers, which wholly or partially prevents the delivery of materials to the insured". Does General Conditions-Territorial Limits apply overall? <u>The actual loss</u>

<u>occurred outside territorial Limits.  The Contingent loss is occurring within Territorial Limits.</u>[2]

Two months later, CNA's claims adjuster, Greg Hunger, discussing the interaction of the Territorial Limitation and the Contingent Business Income coverage, stated to another CNA claims-handler that "I would like to discuss the ramifications of these sections of the policy with you prior to proceeding," and further wrote that "[i]f a covered loss has occurred here, I would hire an accountant to assist me on the net profit, continuing and non continuing expenses."[3]

CNA began circulating internal drafts of a reservation of rights.  The earliest draft reservation of rights letter appeared to argue that there was no coverage because there was no damage to Neltec's equipment:

> There was no direct damage to any Park Electrochemical property in Tempe, Arizona.  Similarly, there was no stoppage due to a covered loss from outside suppliers.  Columbia Casualty Company accordingly reserves rights as to whether the factors of this claim would lead it to be covered under the Contingent Business Interruption coverage.[4]

On September 23, 2003, CNA eventually sent an untimely[5] reservation of rights letter which identified two and only two potential defenses to coverage:

---

[2]    Large Loss Hot Line, dated March 27, 2003 (CCL 000010-13), Farrell Aff., Exh. G (emphasis added).

[3]    Letter, dated May 23, 2003, from Greg Hunger (Senior General Adjuster) to Rick Kuzmanoff (Boiler & Machinery Claims VP) (CCL 000005-9), Farrell Aff., Exh. H.

[4]    Draft Letter, dated Sept. 19, 2003, from Greg Hunger to Murray Stamer (CCL 000123-25), Farrell Aff., Exh. I.

[5]    CNA's own claims handling guidelines emphasize that reservations of rights must be sent on a timely basis.  Property/Auto Physical Damage Claims Handling Guidelines ("Reservation of rights/non-waiver is tendered as appropriate and in a timely manner base upon jurisdictional requirements.") (CCL 000001), Farrell Aff., Exh. J.

(1)     "[T]he Nelco Products Pte., Ltd. facility, which is located in Singapore, is outside of the coverage territory specified in the policy."

(2)     "Nelco Products Pte., Ltd. may not be a 'direct supplier' within the meaning of the Contingent Business Interruption coverage of the policy.  The intent of the policy is not to provide Contingent Business Interruption coverage for losses resulting from such interdependencies."[6]

Thereafter, the consultants hired by CNA variously computed Park's loss at $1,436,993[7] and $1,179,871.[8]  Despite this, and without sharing either of these documents with Park, CNA then took the position that "[p]er the reservation of rights letter, the incident does not appear to be covered," and "[t]he results of the accounting review do not show a financial loss has occurred."[9]  Both statements, of course, were entirely inconsistent with the accounting review and internal CNA documents, which indicated Arizona to be the Location of the Contingent Business Interruption loss.

In its Answer and Affirmative Defenses, Farrell Aff., Ex. A, CNA asserted the following defenses:

(1)     **Explosion Exclusion:**  The Policy does not insured against loss or damage caused by or resulting from "explosion."  Answer and Affirmative Defenses, at 7 (referencing Exclusion B(3)(d): "Unless otherwise provided for and limited in Clause 4 of Section I,

---

[6]     Letter, dated Sept. 23, 2003, from Greg Hunger of CNA to Murray O. Stamer (emphasis added).  Farrell Aff. Exh. K.

[7]     Memorandum, dated Nov. 24, 2003, from Peter Ingerman to Will Cassidy (CCL 000306-08), Farrell Aff., Exh. L.

[8]     Report, dated Dec. 30, 2003, of Ken Kozdra and Peter Ingeman (CCL 000277-86), Farrell Aff., Exh. M.

[9]     Letter, dated June 16, 2004, from Greg Hunger to Kevin Mitchell (CCL 000261-75), Farrell Aff., Exh. N.

Declarations, this Policy does not insure against loss or damage caused by or resulting from the following; *however, if loss or damage from a peril not excluded herein ensues, then this policy shall cover only for such ensuing loss or damage*: ...Id. Explosion, rupture, or bursting of fired or unfired pressure vessels or pipes, steam boilers, steam pipes, steam turbines, steam engines, or flywheels, owned or operated by the Insured.")

(2)    **Exclusions in the Boiler & Machinery Coverage:** The loss is excluded by the following exclusions under the Boiler & Machinery Form: Answer and Affirmative Defenses, at 7-8 (referencing Exclusion BM6 c(2) ("Notwithstanding any provisions to the contrary, the Company assumes no liability under this Coverage Part for any loss: ... from the explosion of accumulated gases or unconsumed fuel within the fire box, or combustion chamber, or any fired vessel or within the flues which conduct the gases of combustion therefrom"); and Exclusion BM6 c(4) ("Notwithstanding any provisions to the contrary, the Company assumes no liability under this Coverage Part for any loss: ... from explosion of an **Object** other than: (i) any steam boiler, steam piping, steam turbine, gas turbine, steam engine, or (ii) any machine or electrical apparatus when such loss is caused by centrifugal force or mechanical breakdown")).

(3) **Design Defect Exclusion:** The loss is excluded by the Design Defect Exclusion. Answer and Affirmative Defenses, at 9 (referencing Exclusion B(3)(a): "Unless otherwise provided for and limited in Clause 4 of Section I, Declarations, this Policy does not insure against loss or damage caused by or resulting from the following; *however, if loss or damage from a peril not excluded herein ensues, then this policy shall cover only for such ensuing loss or damage*: ... Errors or defects in design or specification, errors in processing or manufacture, faulty workmanship or faulty materials.")

(4) **Direct Suppliers:** Under the Contingent Business Interruption coverage, "[t]he damage in question was not to property of a direct supplier of Park."

(5) **Territorial Limits:** Citing the Territorial Limits ("[t]he coverage territory is The United States of America, including its territories and possessions, and Canada," CNA argued that "[t]he damage to the treater occurred in Singapore and not within the territorial limits covered by the Policy," "[t]herefore, no coverage for the loss is afforded under the Policy." Answer and Affirmative Defenses, at 9-10.

(6) **Notice**: "Park did not give timely notice of the loss," "[t]herefore, no coverage for the loss is afforded under the Policy." Answer and Affirmative Defenses, at 10.

CNA subsequently withdrew its defenses based upon the Explosion Exclusion and the Boiler and Machinery Exclusion. Farrell Aff., Exh. O. Neltec therefore seeks partial summary judgment with respect to the "territorial limits" defense, and the defense that Nelco is not a "direct supplier" under the CNA Policy.

## ARGUMENT

### I.    NELTEC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW WITH RESPECT TO CNA'S COVERAGE DEFENSES

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As stated by the United States Supreme Court, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). The proper interpretation of an unambiguous contract is a question of law for the Court, and a dispute on such an issue may properly be resolved by summary judgment. *See, e.g., Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2nd Cir. 1992 ). Because, as demonstrated below, the plain language of the CNA Policy unambiguously rejects the coverage defenses CNA has raised, Park and Neltec are entitled to partial summary judgment with respect to those defenses.

## II. NELTEC'S LOSS OF BUSINESS INCOME TOOK PLACE WITHIN THE COVERAGE TERRITORY OF THE CNA POLICY AND THUS CNA'S "TERRITORIAL LIMIT" DEFENSE IS WITHOUT MERIT

CNA asserts that there is no insurance coverage for Neltec's business income loss because the damaged treater is located in Singapore, which is outside of the "coverage territory" (the United States and Canada) set forth in the "Territorial Limit" provision of the CNA Policy. CNA's "coverage territory" defense is utterly without merit, and finds no support in the CNA Policy. Neltec's only claim for insurance *coverage* in this case is for its loss of business income at its facility in Tempe, Arizona, the Location of the loss, which clearly is within the territorial limits of the CNA Policy. Indeed, the Tempe, Arizona site is a "scheduled" Location. *See* Schedule of Locations and Limits, Farrell Aff., Exh. E. Neltec does not seek insurance coverage for the damage to the treater, and, indeed, Nelco purchased a separate insurance policy to cover any direct damage at the Singapore facility. Thus, it is irrelevant for insurance coverage purposes where the exploded treater is located. Indeed, as discussed above, CNA acknowledged that the real loss at issue was the loss of income, and not the property damage, and questioned whether the "territorial limits" policy provision had any applicability at all in this situation. Farrell Aff. Exh. at G.

Under black-letter New York law, "[w]here a policy is clear, its provisions must be given an ordinary and plain meaning measured by the understanding of a reasonable person." *Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 284, 287 (1st Dep't 1988). *See also State of New York v. Home Indem. Co.*, 486 N.E.2d 827 (N.Y. 1985); *Breed v. Insurance Co. of N. Am.*, 385 N.E.2d 1280 (N.Y. 1978); *United States Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206 (N.Y. 1986) (holding that clear and unambiguous terms should be understood in their plain, ordinary, popular and

nontechnical sense); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 314 N.E.2d 37 (N.Y. 1974) (insurance policy provisions should be given the meaning of "an ordinary business man in applying for insurance and reading the language of the policies when submitted.")

The only "reasonable" interpretation of the "territorial limits" provision — which refers to *coverage* territory — is that the provision limits *coverage* to losses that take place within the CNA Policy's territory. There is nothing in the language of the CNA Policy to support CNA's position that the triggering event also must take place within the CNA Policy's coverage territory. Because Neltec's claim is for a lost stream of income at its Tempe, Arizona facility, a Location within the territorial limits of the policy, Neltec is entitled to judgment as a matter of law on this defense.

Moreover, if CNA had wanted to impose a requirement of coverage that damage to the property of a supplier had to take place within the coverage territory of the policy, it could easily have written the CNA Policy that way, but chose not to do so. In *Pentair, Inc. v. American Guarantee & Liability Insurance Co.*, No. Civ. 02-3696, 2003 WL 21804874, *2 (D. Minn. July 31, 2003), for example, the insurance policy at issue expressly stated it provided coverage for "property of a supplier of goods and/or services to the Insured, or a receiver of goods and/or services from the Insured, *such supplier or receiver to be located within the territory defined in Section 9.*" (emphasis added). *See also* Factory Mutual Insurance Company's Notice of Motion and Motion for Summary Judgment; Supporting Memorandum of Points and Authorities, filed May 27, 2004 in *County of Clark v. Factory Mut. Ins. Co.*, No. CV-S-02-1258 (D. Nev.), at 5-6 (policy form agreed to provide Contingent Business Interruption coverage for loss

caused by physical loss or damage "at any locations of direct suppliers or customers located within the TERRITORY of this Policy.") (Farrell Aff., Exh. P).

Where an insurance company chooses to write an insurance policy one way, when it could easily have written it another, it has to be bound by the terms of the policy *as written*. *See, e.g., Great N. Ins. Co. v. Dayco Corp.*, 637 F. Supp. 765, 780 (S.D.N.Y. 1986) (holding that "[i]f [the insurance company] had intended to exclude a loss where an employee's dishonest act was only a contributing factor, it could have drafted the exclusion to cover this situation."); *Hartol Prods. Corp. v. Prudential Ins. Co.*, 47 N.E.2d 687, 690 (N.Y. 1943) (holding that, "if [the insurance company] intended to exclude coverage in this case, it should have said so in plain and unambiguous terms"). CNA should not be permitted to solicit this Court's help to re-write the CNA Policy it sold to Park. *Northwest Agr. Co-op. Ass'n, Inc. v. Continental Ins. Co.*, 769 P.2d 218, 220 (Or.App. 1989) (holding that "If [the insurance company's] had intended to exclude from coverage [certain] losses . . . it could have done so easily. . . . [The insurance company's] interpretation of its policy is not so compelling that we are persuaded to add exclusionary language that defendant could have, but did not, put in the policy."). Indeed, "a court is not free to ʼmake or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation.ʼ" *2619 Realty, LLC v. Fidelity & Guar. Ins. Co.*, 756 N.Y.S.2d 564, 566 (1st Dept. 2003), quoting *Breed v. Insurance Co. of N. Am.*, 385 N.E.2d 1280 (N.Y. 1978).

## III. THE CNA POLICY DOES NOT REQUIRE AS A CONDITION OF COVERAGE THAT THE "DIRECT SUPPLIER" BE A NON-OWNED ENTITY

The CNA Policy specifically provides, in pertinent part, that

the Company will pay for loss resulting from necessary interruption of business conducted at **_Locations_** occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:

    **a.**    any real or personal property of direct suppliers.

Farrell Aff., Exh. E. Contingent Business Interruption coverage is designed to insure a policyholder for loss of income in the policyholder's operations caused by physical loss to or destruction of "contributing" (supplier) or "recipient" (customer) locations. *See, e.g.* Alan R. Miller, *Business Interruption Insurance for Damage to Other Property*, FICC Q., Vol. 53, Issue 3 (Apr. 1, 2003) (holding that "[c]ontingent business interruption insurance protects the earnings of the insured following physical loss or damage to the property of the insured's suppliers and. or customers" ). Farrell Aff. at Exh. Q.

CNA has asserted that the Contingent Business Interruption provision in the CNA Policy does not provide coverage for Neltec's loss of business income in this case because "direct supplier" in the policy provision refers *only* to *non-owned* entities. CNA asserts that because Nelco is a wholly-owned subsidiary of Park, that there can be no coverage for this claim. Farrell Aff. at Exh. A. There is nothing in the policy language to support CNA's position.

Under New York law, all unambiguous agreements must be enforced according to their clear terms, without resort to extrinsic evidence. *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272 (2d Cir.1992) (holding that "[i]f a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature."). *See also Royal Sun Alliance Ins. Co. v. Travelers Ins. Co.,* 791 N.Y.S.2d 117, 118 (2d Dept. 2005); Sayers *v. Rochester Tel.*

*Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094-95 (2d Cir. 1993); *Royal Ins. Co. of America v. Lexington Ins. Co.*, No. 02 CIV 2085, 2004 WL 1620877, *2 (S.D.N.Y. July 20, 2004) (holding that "when language in a contract is clear, the court must construe the contract and grant summary judgment without reference to extrinsic evidence."); *Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145, (2d Cir. 2005) (holding that "if contract is unambiguous on its face, parties' rights under such contract should be determined solely by terms expressed in instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.").

Here, "direct supplier" is not defined in the Policy, nor is there any indication anywhere in the policy that "direct suppliers" refers only to entities not related to or owned by the policyholder. Where a term is undefined, the court must look to the plain meaning of the undefined terms, and interpret them in the way that an ordinary person would. *Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 284, 287 (1st Dep't 1988). *See also State of New York v. Home Indem. Co.*, 486 N.E.2d 827 (N.Y. 1985); *Breed v. Insurance Co. of N. Am.*, 385 N.E.2d 1280 (N.Y. 1978); *United States Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206 (N.Y. 1986); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 314 N.E.2d 37 (N.Y. 1974) (holding that undefined terms should be given the meaning of "an ordinary business man in applying for insurance and reading the language of the policies when submitted."). It is hard to conceive of any ordinary person understanding "direct supplier" to be limited to suppliers who are not owned by the policyholder, especially when such direct suppliers have their own coverage program.

A court may also look to the dictionary definition of an undefined term in order to assist it in ascertaining the "ordinary meaning" of that term. *See, e.g., Mazzola v. County of Suffolk,* 533 N.Y.S.2d 297 (2nd Dept. 1988) (holding that "it is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract"). The dictionary definition of "direct supplier" supports Neltec's position, and offers no support for CNA's attempt to limit coverage. "Supply" is defined as "to furnish or provide with what is lacking, requisite." Random House Unabridged Dictionary, Random House 2006. "Direct" means "without intervening person, influences, factors, etc." American Heritage Dictionary of the English Language, 2006. *See also Pentair, Inc. v. American Guar. & Liability Ins. Co.,* No. Civ. 02-3696, 2003 WL 21804874, *1 (D. Minn. July 31, 2003) (holding that a utility is not a "direct" supplier if it does not supply to the policyholder directly, but through a middleman). Thus, the ordinary meaning of "direct supplier" is one who furnishes or provides what is lacking or requisite, without any intervening persons or factors. There is nothing in this meaning that would indicate that the supplier cannot be owned by the entity to which it is directly supplying the required materials.

Indeed, one court, in considering similar language gave the word "supplier" an expansive meaning, and refused to impose limitations on that term that were not found in the insurance policy. In *Archer-Daniels-Midland Co. v. Phoenix Assurance Co. of New York,* 936 F. Supp. 534 (S.D.Ill. 1996), the court interpreted the phrase "any supplier of goods and services" language. The court concluded, based on the dictionary definition of supplier as "one or that which supplies," that "any supplier of goods and services" was an unrestricted group of those who furnish what is needed or

desired. The court refused to restrict the meaning of "suppliers" to principal suppliers, direct suppliers, or suppliers with whom the insured had a contractual relationship. Likewise, this Court should refuse to restrict "direct suppliers" as used in the CNA Policy to non-owned entities.

CNA will undoubtedly seek to introduce "evidence" of purported industry "custom and practice" that "supplier" means a non-owned entity. To the extent any such evidence even exists, however, it is *extrinsic* evidence, and thus cannot properly be considered by the court to vary or contradict the unambiguous policy language. *Brandt Corp. v. City of New York*, 199 N.E.2d 493, 495 (N.Y. 1964) (holding that "[a]ny custom or practice which might have existed . . . . could not vary rights expressly and clearly provided for by the contract. . . . Nothing short of a modification of the contract, or a waiver of its provisions would avoid" the plain language of the contract.); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (holding that "evidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties"), citing *Croce v. Kurnit*, 737 F.2d 229, 238 (2d Cir.1984) and *In re Western Union Telegraph Co.*, 86 N.E.2d 162, 166 (N.Y. 1949). Indeed, even if evidence of such "custom and practice" existed, which it does not, and even if such evidence was admissible, which it is not, CNA still could not prevail on this defense, because CNA cannot establish, as it must, that "the party sought to be bound [Park] was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it." *British Int'l. Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir.2003) citing *Reuters Ltd. v. Dow Jones Telerate, Inc.*, 662 N.Y.S. 2d 450 (1st Dept. 1997).

## CONCLUSION

For all of the foregoing reasons, this court should grant Plaintiffs' motion

for partial summary judgment on CNA's "territorial limits" and "direct supplier" coverage

defenses.

Dated: September 8, 2006
(corrected as of October 24, 2006)

ANDERSON KILL & OLICK, P.C.

Richard P. Lewis (RL-2227)
1251 Avenue of the Americas
New York, NY  10020-1182
(212) 278-1000

Counsel for Plaintiffs
Park Electrochemical Corp. and Neltec, Inc.