UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

PARK ELECTROCHEMICAL CORP. and
NELTEC, INC.,

                               Plaintiffs,

- against -

CONTINENTAL CASUALTY COMPANY,

                               Defendant.

------------------------------------------------------------X

**MEMORANDUM AND ORDER**

04-CV-4916 (ENV) (ARL)

**VITALIANO, D.J.**

Plaintiffs Park Electrochemical Corporation ("Park") and Neltec, Inc. ("Neltec"), a wholly owned subsidiary of Park, bring this action against Continental Casualty Company ("Continental"), seeking to recover, under the "contingent business interruption" provision of a property insurance policy issued by Continental, No. RMP 210728811, effective from May 30, 2002 through May 30, 2003 ("the policy"), certain income allegedly lost by Neltec. Pursuant to Fed. R. Civ. P. 56, Continental has moved for summary judgment, and plaintiffs have filed a cross-motion for partial summary judgment. For the reasons below, Continental's motion is denied, and plaintiffs' motion is granted as to the question of territorial limits but is otherwise also denied.

## I. BACKGROUND

### A. Factual Background

Among other lines of business, Park develops and manufactures printed circuit boards and other advanced materials for the telecommunications, computing, and aerospace industries. Neltec and Nelco Products, Pte., Ltd. ("Nelco") are wholly-owned subsidiaries of Park. Neltec, based in Tempe, Arizona, manufactures and sells a product called N6000. Neltec purchases its

1

entire supply of "prepreg," a vital component of N6000, from Nelco, located in Singapore. On November 27, 2002, an explosion at Nelco's Singapore facility destroyed the special "treater" used to produce prepreg, temporarily halting Nelco's ability to supply prepreg to Neltec and, per force, Neltec's ability to produce N6000. According to plaintiffs, Neltec's N6000 customers could not readily substitute any alternative Neltec product, causing Neltec to lose a significant amount of income.[1]

Nelco's facility in Singapore was separately insured by Royal & SunAlliance Insurance, Ltd. ("Royal"), which paid Nelco nearly $7.4 million in connection with the explosion that destroyed the prepreg treater. Royal did not cover any of Neltec's lost income. On March 12, 2003, Neltec notified Continental of a claim under the policy for over $2.6 million in lost income. Continental subsequently disclaimed coverage.[2]

B. **The Continental policy**

The policy identifies the "Named Insured" as Park "and its [existing] subsidiaries and affiliated companies." In the "General Conditions" section, the policy states that "[t]he coverage territory is The United States of America, including its territories and possessions, and Canada." The "Coverage" section of the policy provides that, "subject to the Limits of Liability . . . and all other policy provisions," Continental would insure against "all risks of direct physical loss of or damage to property and/or interests described" in 29 enumerated "Covered Interests/Perils,"

---

[1] Continental contends that Neltec's customers could have used alternative Neltec products in place of N6000 and that, in fact, Neltec offered these substitute materials to its customers after the explosion. The Court will not address this issue, as the parties' summary judgment motions concern the scope of coverage provided by the policy, not the extent of Neltec's alleged losses. As to the facts relevant to the motions for summary judgment, there is no substantial dispute among the parties.

[2] Continental's other defenses were not advanced and will not be considered on its motion for summary judgment.

among which were "Time Element – Gross Earnings" and "Contingent Business Interruption."[3]

Under "Time Element – Gross Earnings," the policy states:

> This policy covers against loss resulting from necessary interruption of business caused by direct physical damage to or destruction of real or personal property . . . at Locations occupied by the Insured.

Under "Contingent Business Interruption," the policy states:

> [Continental] will pay for the loss resulting from necessary interruption of business conducted at Locations occupied by the Insured and covered in this policy, caused by direct physical damage or destruction to:
>
> a. any real or personal property of direct suppliers which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured...

The term "direct suppliers" is not defined anywhere in the policy.

For claims under the contingent business interruption ("CBI") provision, the policy covers up to $10 million per occurrence for "Named Locations," and $2.5 million for "Unnamed Locations." The policy lists 15 "Named Locations," all within the United States, including two Neltec facilities in Tempe, Arizona.

After the November 27, 2002 explosion at Nelco's facility in Singapore, Park submitted a claim under the CBI provision, seeking coverage for Neltec's lost sales income. Continental declined coverage and now makes two arguments in support of its motion for summary judgment: (1) that Nelco's facility in Singapore was not a covered location and was excluded by the "Territorial Limits" of the policy, and (2) that subsidiaries of the insured, such as Nelco, are not considered "direct suppliers" under the policy. Neltec, in turn, seeks partial summary

---

[3] "Time Element – Gross Earnings" and "Contingent Business Interruption" are both types of "time element" coverage. "Time element coverage reimburses the insured for losses directly related to the period of time necessary to restore the damaged property to its normal condition." Retail Brand Alliance v. Factory Mut. Ins. Co., 489 F. Supp. 2d 326, 328 n.1 (S.D.N.Y. 2007).

3

judgment against Continental separately rejecting its "territorial limits" defense and "direct suppliers" defense.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court must grant summary judgment upon finding that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509 (1986). To decide whether summary judgment is proper, "the court cannot try issues of fact but can only determine whether there are issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 15-16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). A court must construe all evidence in the light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).

If the moving party makes a prima facie showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and set forth "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002), without reliance on "conclusory statements, conjecture, or speculation," Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). Ultimately, the court shall decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S. Ct. at 2512. Moreover, with cross-motions for summary judgment, a

court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

B.   **Interpretation of Insurance policy Language**

When called upon to interpret an insurance contract governed by New York law,[4] the court is first required to determine, as a matter of law, whether the relevant provision is ambiguous or unambiguous. See, e.g., Broad Street, LLC v. Gulf Ins. Co., 37 A.D.3d 126, 130, 832 N.Y.S.2d 1, 4 (N.Y. App. Div. 2006); 2619 Realty v. Fidelity & Guar. Ins. Co., 303 A.D.2d 299, 300, 756 N.Y.S.2d 564, 565-66 (N.Y. App. Div. 2003). The Second Circuit has held that

> an ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000). If the provision is unambiguous, it must be given its plain and ordinary meaning, and the construing court may not create policy terms by implication. Broad Street, 37 A.D.3d at 130-31, 832 N.Y.S.2d at 4. Moreover, absent ambiguity, a court may not consider extrinsic evidence. Kinek v. Paramount Commc'ns, Inc., 22 F.3d 503, 509 (2d Cir. 1994).

Conversely, "[o]nce a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006) (internal quotation marks omitted). Along with evidence of the parties' intent, courts have considered extrinsic evidence such as industry custom and practice, state and federal law, and dictionary definitions. See, e.g., Zurich Am. Ins. Co. v.

---

[4]   The parties do not contest the applicability of New York law.

ABM Indus., Inc., 397 F.3d 158, 169 (2d Cir. 2005) (dictionary definitions and federal law); Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 617-18 (2d Cir. 2001) (state and federal law); Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992) (industry custom and practice).

Such consideration of extrinsic evidence "ordinarily requires denial of summary judgment," but a court may still grant it "where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (quoting Compagnie Financière de CIC et de l'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000)). Similarly, a court may grant summary judgment notwithstanding ambiguities in the policy language "where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). Generally under New York law, though, "[w]here extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentem rule of contract construction and construe any ambiguities in the contract against the insurer as a matter of law." Morgan Stanley, 225 F.3d at 279. However, "if extrinsic evidence is available but inconclusive," id. at 276, or it "raises a question of credibility or presents a choice among reasonable inferences," id. at 279 (quotation omitted), the ambiguity in question should be considered at trial, rather than applying the contra proferentem rule at the summary judgment stage. See also In re Prudential Lines Inc., 158 F.3d 65, 77 (2d Cir. 1998); Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983) (holding that contra proferentem "is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument").

## C. Analysis of the Continental policy

### 1. Territorial Limits Defense

Continental argues that the policy's CBI provision requires both the physical property damage and the loss of business to have occurred within the policy's territorial limits, concluding that, because the property damage allegedly causing the business loss occurred in Singapore, there was no coverage. Park responds that the only relevant loss was the financial loss, which occurred not at Nelco's Singapore facility but at Neltec's location in Tempe, Arizona, which, undisputedly, was included as a Named Location in the policy — that is, the loss was covered because it occurred not only within the territorial limits of the policy but also at a scheduled location.

It is plain to the Court that the CBI language is unambiguous and clearly provides coverage for Neltec's loss at Tempe. The provision states that Continental "will pay for the loss resulting from necessary interruption of business conducted at Locations occupied by the Insured and covered in this policy...." The loss covered is not physical damage to property but a financial shortfall, and that shortfall must occur within the territorial limits of the policy. The coverage is not, however, totally open-ended, as the financial shortfall must be "caused by direct physical damage or destruction to ... any real or personal property of direct suppliers." But the limitation stops there: the policy says nothing about where the "direct physical damage or destruction" must occur. If Continental wished to place a territorial limit on where "direct suppliers" must be located in order for coverage to attach, it could have included explicit language to that effect.[5] This Court may not and will not read additional terms into the policy by implication or speculation. See Broad Street, 37 A.D.3d at 131, 832 N.Y.S.2d at 4. The words

---

[5] Indeed, the policy *does* include an explicit territorial restriction in its "Time Element – Gross Earnings" provision, which specifically "covers against loss resulting from necessary interruption of business caused by direct physical damage to or destruction of real or personal property . . . at Locations occupied by the Insured."

7

of the CBI provision are unambiguous and will be given their plain and ordinary meaning. There is no dispute that the business interruption loss occurred in Arizona, that the loss was caused by direct physical damage to Nelco's property, and that Nelco is one of Neltec's direct suppliers. The loss is within all four corners of this aspect of the policy provision. Summary judgment for the plaintiffs on the issue of territoriality is therefore appropriate.

    2.  <u>Direct Suppliers Defense</u>

Continental also argues that coverage is not warranted under the CBI provision because subsidiaries of the insured may not be considered "direct suppliers" under the policy. Park challenges this reading, contending that nowhere in the policy is such a restriction found.

The language of the policy on this point is vague and ambiguous. The term "direct suppliers" is not defined anywhere in the policy. Both parties provide reasonable interpretations of the term: it could be read to include any supplier, regardless of whether the supplier is a subsidiary of the insured, or it could be read to exclude subsidiaries or sister companies of the insured. Moreover, on the one hand, if the term is read to include subsidiaries, then it would arguably make the CBI provision redundant, given that the "Time Element – Gross Earnings" provision already covers business interruption losses caused by physical damage to Park-owned facilities — that is, to avoid redundancy, the CBI provision must have been specifically intended to cover business interruption losses caused by damage to "direct suppliers" outside of Park's control. On the other hand, insurance policies may have multiple or redundant provisions covering certain kinds of losses. The fact remains that the words are ambiguous, and ambiguity requires the Court to consider extrinsic evidence to arrive at a proper interpretation. See <u>Parks Real Estate</u>, 472 F.3d at 43.

Advancing to the consideration of extrinsic evidence, Continental proffers that its interpretation accords with the common practice of the insurance industry, pursuant to case law

8

as well as treatises and commentaries. See Zurich, 397 F.3d at 168 ("Entities that rely on 'third parties' sometimes purchase CBI coverage as a policy extension in case their income is disrupted by damage to third party property."); Pentair, Inc. v. Am. Guar. and Liab. Ins. Co., 400 F.3d 613, 615 n.3 (8th Cir. 2005) ("The word 'contingent' is something of a misnomer; it simply means that the insured's business interruption loss resulted from damage to a third party's property."); CII Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of Louisiana, Inc., 05-0071 , p. 1, n.1 (La. App. 4 Cir. 8/17/05); 918 So.2d 1060, 1061 n.1 ("Business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to the insured's own property. Contingent business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to property that the insured does not own, operate, or control."); see also Jeffrey W. Stempel, Stempel on Insurance Contracts § 24.02[D] (2007 supp.) (stating that business interruption coverage "applies when the policyholder's own property has been directly damaged or restricted and business revenue is lost as a result" and that CBI coverage "applies when the property or operations of another have been damaged or restricted and this results in revenue loss to the policyholder"); Alan R. Miller, Business Interruption Coverage, Practicing Law Institute, Litigation and Administrative Practice Course Handbook Series (2005) ("Contingent business interruption insurance coverage applies to business interruption losses caused by physical loss or damage to the property of the insured's suppliers and/or customers, as opposed to the insured's own property."); 1 Stephen A. Cozen, Insuring Real Property § 3.03[2], p. 3-73 (2004) ("[C]ontingent business interruption coverage is not available if the other property is a branch, department or subsidiary or sister business of the insured."); Paula B. Tarr, Where Have All the Customers Gone? Business Interruption Coverage for Off-Premises Events, The Brief, Winter 2001, at 20, 28 (American Bar Assoc. 2001) (describing CBI provisions as

covering loss due to damage to "businesses that are not owned, operated, or controlled by the insured").

Notwithstanding these references to the industry norm, in two of the precedents cited by Continental, the insurance policies explicitly stated CBI coverage was limited to loss caused by damage to entities not owned by the insured, which, of course, Continental failed to provide in the policy here. See, e.g., Zurich, 397 F.3d at 162 (covering loss "due to the necessary interruption of business as the result of direct physical loss or damage of the type insured against to *properties not operated by the Insured* which wholly or partially prevents any direct supplier of goods and/or services to the Insured from rendering their goods and/or services") (emphasis added); CII Carbon, 918 So. 2d at 1064 (covering "loss directly resulting from the necessary interruption of business conducted on the premises occupied by the Insured, caused by damage to or destruction of any real or personal property, not otherwise excluded by this policy, and referred to as CONTRIBUTING PROPERTY(IES) and/or RECIPIENT PROPERTY(IES) and which is *not operated by the Insured*, by peril(s) insured against during the term of this policy, which wholly or partially prevents delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured's business") (emphasis added).[6] With such express or contextual subtleties, it is difficult to extrapolate an ironclad general rule from these specific authorities, given the instances where the policy

---

[6] Continental's reliance on the Cozen treatise is similarly undermined by the context of the general rule supposedly stated. The rule there is stated in the context of explicit policy provisions that putative drafters should use. The full quote reads: "The policy must identify the specific contributing (or recipient) properties in question, listing name, location and type of occupancy. These must be properties that are not owned, operated or controlled by the insured; contingent business interruption coverage is not available if the other property is a branch, department or subsidiary or sister business of the insured." 1 Stephen A. Cozen, Insuring Real Property § 3.03[2], p. 3-73 (2004). Indeed, if Continental had followed Cozen's advice and explicitly listed what "direct suppliers" would be covered under the CBI provision, this dispute would have been avoided.

10

language was far more clear and explicit than the language Continental chose to include in the policy here.

Continental retorts that the Claim Preparation Manual from Park's insurance broker, Aon Risk Services, provided Park with the proper definition of CBI coverage. The manual indeed states that "the supplier/receiver cannot be owned [sic] or a subsidiary of the insured party." Yet, while the manual provides evidence of standard practice in the insurance industry, it is, at the same time, not probative of the intent of the parties at the time they entered into the contract, since the manual was not provided to Park until after the Singapore incident.

As for the deposition testimony submitted on the motions, the most helpful testimony was provided by the witnesses from Aon. Aon representative Paula Campiglia acknowledged that, generally, CBI provisions exclude entities owned or controlled by the insured, but she found it significant that the Continental policy lacked any such explicit limitation, distinctly suggesting to her that the limitation might not apply here. (Campiglia Dep. 57 ("[I]t was, you know, an alert that there was no definition of what a direct supplier was.").) David Passman, Aon's director of property claims, drew a contrast between CBI coverage and what he calls "interdependency" coverage: "[T]raditionally, the understanding in the insurance industry or the definitions as put forth in various policies is that contingent coverage applies when it is a nonowned customer and supplier, and interdependency applies when it is an owned customer or supplier." (Passman Dep. 36-37.) Further, Passman testified that interdependency coverage may be implied in some instances: "[T]here may be certain programs and certain policy understandings where actual interdependency wording may not be necessary to provide the quote, unquote, interdependency coverage." (Passman Dep. 36.) He then reiterated this point: "[T]here may be certain situations in a property insurance program where the policies or the policy might afford interdependence coverage without actually having an interdependency clause in the policies." (Passman Dep. 37.)

11

The Court finds that ambiguity survives the proffers of extrinsic evidence here. While ambiguity in policy language is normally construed against the insurer, where, as here, the "extrinsic evidence is available but inconclusive," Morgan Stanley, 225 F.3d at 276, and the available evidence "presents a choice among reasonable inferences," id. at 279 (quotation omitted), application of the contra proferentem rule is not appropriate on summary judgment. Accordingly, the question of whether subsidiaries may be "direct suppliers" under the policy will be one for the jury to assess, weighing the conflicting inferences that may be drawn from the common practice and customs of the insurance industry and, ultimately, the knowledge and intent of the parties at the time the policy was purchased. As to this issue, the cross motions for summary judgment are both denied.

## III. CONCLUSION

For all of the foregoing reasons, Continental's motion for summary judgment is denied, and plaintiffs' cross-motion for partial summary judgment is (a) granted as to Continental's "Territorial Limits" defense and (b) denied as to Continental's "direct suppliers" defense.

The parties are directed to contact Magistrate Judge Lindsay to make final preparations for trial.

SO ORDERED.

Dated: Brooklyn, New York
February 16, 2011

s/ENV

_____
ERIC N. VITALIANO
United States District Judge